526 A.2d 1180

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**Peter M. STERN, Respondent.**

Supreme Court of Pennsylvania.

Argued Jan. 29, 1987.

Decided June 3, 1987.

Paul J. Burgoyne, West Chester, for petitioner.

Arthur W. Lefco, Philadelphia, Harold Cramer, Harrisburg, for respondent.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

This Court, in response to the Report and Recommendation filed in this matter by the Disciplinary Board of the Supreme Court of Pennsylvania ("Board"), has issued a Rule to Show Cause why Respondent, Peter M. Stern, should not be disbarred from the practice of law in the Commonwealth of Pennsylvania. Having considered the pleadings and briefs filed by Respondent and the Office of Disciplinary Counsel, having heard oral argument, and after a full review of the record submitted by the Board, we are constrained to conclude that the Rule to Show Cause must be made absolute and Respondent disbarred.

### I.

The Office of Disciplinary Counsel filed a Petition for Discipline on January 14, 1985, in which it alleged that Respondent had violated four provisions of the Disciplinary Rules of the Code of Professional Responsibility, specifically:

(1) DR 1–102(A)(3), prohibiting an attorney from engaging in illegal conduct involving moral turpitude;

(2) DR 1–102(A)(4), prohibiting an attorney from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;

(3) DR 1–102(A)(6), prohibiting an attorney from engaging in other conduct which adversely reflects on his fitness to practice law; and

(4) DR 1–102(A)(7), prohibiting an attorney from counselling or assisting a client in conduct the attorney knows to be illegal or fraudulent.

The immediate predicate for the Petition for Discipline was a letter in response to a request from the Office of Disciplinary Counsel, from the United States Attorney for the Eastern District of Pennsylvania. That letter stated that Respondent had been one of the principal government witnesses in the prosecution of William O'Farrell, President of

Teamsters' Union Local 500, for attempting to extort a Fifteen Thousand Dollar ($15,000.00) bribe from one of Respondent's clients. The United States Attorney further related that he had been aware of an allegation made by the Federal Bureau of Investigation that Respondent had made an unrelated payment of Five Thousand Dollars ($5,000.00) to O'Farrell on behalf of another client, and that Respondent made admissions concerning that allegation.

The Petition for Discipline was referred to a Hearing Committee on February 14, 1985.[1] That Committee conducted a hearing on September 26, 1985, during which a detailed stipulation of facts was adopted, and filed its Report on February 27, 1986. The Hearing Committee found that Respondent had violated only DR 7–102(A)(7), and recommended a private informal admonition by Disciplinary Counsel or, at most, a private reprimand by the Board. See Pa.R.D.E. 204(a)(5), (6). Exceptions were filed by the Office of Disciplinary Counsel and, on April 9, 1986, the matter was referred to the Board. In its Report and Recommendation, transmitted to this Court on July 7, 1986, the Board concluded that Respondent had violated DR 1–102(A)(3), DR 1–102(A)(4), DR 1–102(A)(6), and DR 7–102(A)(7), and recommended the imposition by this Court of a public censure, see Pa.R.D.E. 204(a)(3), and the payment of costs, see Pa.R.D.E. 208(g)(1).

Upon consideration of the Board's Report and Recommendation, this Court issued upon Respondent a Rule to Show Cause why he should not be disbarred. Respondent's re-

1. At an early stage of the proceedings before the Hearing Committee, Respondent argued that the *corpus delicti* rule employed in criminal prosecutions should be applicable in Disciplinary Board proceedings. A majority of the Hearing Committee assigned to this matter rejected that contention. That argument was not subsequently raised before the Board. Respondent has attempted to revive his *corpus delicti* theory before this Court. Having entered into a stipulation of facts to obviate the need for testimony to establish his culpability and to improve his chances for lenient treatment, Respondent will not now be heard to complain that his admissions are insufficient evidence to prove his transgressions.

quest for oral argument was granted.[2] Having been briefed and argued, this matter is now ripe for disposition.

## II.

Our scope of review and the criteria which guide us in evaluating the evidence in attorney disciplinary matters have been recently set forth in *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986):

> Before analyzing the testimony offered in support of the charges it must be noted that this Court's review of attorney discipline is a *de novo* one. Thus, we are not bound by the findings of either the Hearing Committee or the Disciplinary Board. *Matter of Green,* 470 Pa. 164, 368. A2d 245, (1977); *Office of Disciplinary Counsel v. Walker,* 469 Pa. 432, 366 A.2d 563 (1976); *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 345 A.2d 616 (1975), *cert. denied,* 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976). Although we are free to evaluate the evidence presented before the Hearing Committee, *In re Silverberg,* 459 Pa. 107, 327 A.2d 106 (1974), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 849 (1982), we may be enlightened by the decisions of these triers of fact who had the opportunity to observe the demeanor of the witnesses during their testimony. *Matter of Green, supra; Office of Disciplinary Counsel v. Walker, supra; Office of Disciplinary Counsel v. Campbell, supra.....* Nor is the petitioner required to establish the misconduct through direct evidence. The ethical violations may be proven solely by circumstantial evidence. *Office of Disciplinary Counsel v. Grigsby, supra; Lemisch's Case,* 321 Pa. 110, 184 A. 72 (1936); *Salus's Case,* 321 Pa. 106, 184 A. 70 (1936).

*Id.,* 509 Pa. at 579–80, 506 A.2d at 875.

**2.** Pursuant to Pa.R.D.E. 208(e)(3), Respondent had an absolute right to oral argument upon request. Respondent, however, also requested an evidentiary hearing before this Court, a procedure for which the Rules of Disciplinary Enforcement make no provision. This writer denied that request on November 10, 1986.

We will first consider the findings of fact made by the Hearing Committee. Prior to the hearing in this matter, Respondent and the Office of Disciplinary Counsel entered into detailed stipulations which were ultimately adopted by the Hearing Committee as findings of fact. The relevant facts as set forth in those stipulations are as follows.[3]

Respondent was born in 1941 in Philadelphia. He graduated from Cheltenham High School, where he was editor-in-chief of the school newspaper. Respondent then attended Dartmouth College, where he was vice-president of his class and managed the campus radio station. While at Dartmouth Respondent won a fellowship which enabled him to work for academic credit at the National Labor Relations Board in Washington, D.C. Respondent graduated from Dartmouth with high honors in 1963 and subsequently entered the University of Pennsylvania Law School, where he was an editor of its Law Review, wrote several articles on labor law, and assisted a professor in writing a labor law treatise. He graduated from law school cum laude in 1966 and was admitted to the Pennsylvania Bar in November of that year.

Following law school Respondent practiced labor law for three years as an associate with the firm of Goodis, Greenfield, Narin and Mann. In 1969 Respondent moved to the firm of Blank, Rome, Comisky and McCauley ("Blank, Rome") and became a partner in that firm three years later. At Blank, Rome, Respondent supervised several other attorneys in the labor section. He also chaired the Philadelphia Bar Association's Labor Law Committee during the mid–1970's.

Respondent was responsible for some of Blank, Rome's most significant labor clients, including numerous clients in the food and paper converting industries. One of the largest of those clients was the Frankford Quaker Grocery Company ("Frankford Quaker"), which served a local supermarket chain. In 1980 Frankford Quaker experienced fi-

---

3. Facts omitted from the Stipulations will be provided in footnotes and in subsequent text.

nancial difficulties due to a shrinkage in volume and sought the cooperation of Local 500 of the Teamsters Union, which represented Frankford Quaker's employees, with regard to work assignments. Officers of Frankford Quaker asked respondent to deliver Five Thousand Dollars ($5,000.00) to William O'Farrell, President of Local 500, in the hope that O'Farrell would not oppose the requested assistance. Respondent initially refused to deliver the money but eventually acceded to his client's demands when Frankford Quaker threatened to retain other counsel. Respondent met with O'Farrell on two occasions, successfully delivering the Five Thousand Dollars ($5,000.00) on the second occasion.

Some time later O'Farrell demanded that another of Respondent's clients, Data File, Inc., pay O'Farrell a Fifteen Thousand Dollar ($15,000.00) bribe. Respondent refused and advised Data File not to make such a payment, whereupon he was discharged as counsel. In early 1982 the Federal Bureau of Investigation ("FBI") began investigating bribes allegedly extorted by O'Farrell. Respondent met with two Assistant United States Attorneys and an FBI agent in or about January, 1983. During the meeting, Respondent acknowledged his delivery of Frankford Quaker's funds to O'Farrell.[4] Based on the information provided by Respondent concerning O'Farrell's alleged attempt to extort money from Data File, Inc., the federal government obtained the indictment of O'Farrell in the United States District Court for the Eastern District of Pennsylvania. Respondent served as the principal prosecution witness.[5]

---

**4.** The FBI had learned of Respondent's payment to O'Farrell from a confidential source and had furnished the United States Attorney with that information. *See* N.T. Sept. 26, 1985 at 9–10, 14, 47. The prosecution was concerned that the information concerning Respondent's prior involvement with O'Farrell was subject to disclosure to the defense under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as exculpatory evidence. We find it disturbing, however, that the United States Attorney's office did not, upon acquiring that information, also immediately communicate it to the Disciplinary Board pursuant to DR1–103.

**5.** Respondent did not request immunity, but the prosecution nevertheless immunized him as a precaution. While the stipulations do not

In Paragraph 11 of the Stipulations Respondent admits that his delivery of the funds to O'Farrell in violation of the Labor Management Relations Act violated DR7–102(A)(7). The Stipulations also include various evidence in mitigation, which shall be discussed later.

In addition to adopting the Stipulations summarized above, the Hearing Committee made two additional findings of fact:

6.1 On the second occasion, when O'Farrell accepted the $5,000 proferred by Respondent, O'Farrell told respondent that he, O'Farrell[,] considered it a gift and that he did not intend to do anything for it.

6.2 On the second occasion when Respondent proferred and O'Farrell accepted the $5,000.00, Respondent did not expect or intend that O'Farrell would be influenced in respect to any of his actions, decisions, or duties as a representative of Frankford Quaker employees.

The Disciplinary Board in its Report and Recommendation to this Court questioned these two findings but did not decide whether Respondent's payment to O'Farrell was a bribe or a gift. The Board did, however, recognize that either type of payment would violate federal law.[6] This Court considers the intent to influence a crucial factor in determining the gravity of Respondent's breach of our ethical standards. Accordingly, we have independently examined the record before us, as is our right and obligation, and have concluded that the Hearing Committee's findings with respect to Respondent's delivery of Frankford Quaker's funds to O'Farrell are supported by no credible evidence.

The Hearing Committee's finding that Respondent's payment to O'Farrell was a mere "gift" is at odds with evi-

address the outcome of the trial, it appears from the record of the instant matter that O'Farrell was acquitted. N.T. Sept. 26, 1985 at 122.

**6.** Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, is "a criminal provision, malum prohibitum, which outlaws all payments, with stated exceptions, between employer and representative." *United States v. Ryan,* 350 U.S. 299, 305, 76 S.Ct. 400, 404, 100 L.Ed. 335 (1956).

dence furnished by the United States Attorney's office and with Respondent's own testimony. In its letter to the Board dated December 19, 1983, the United States Attorney's Office states:

> Stern explained that he represented a client named "Frankford-Unity, Inc.," as labor lawyer. The client had a dispute with its employees, who were represented by Local 500 of the Teamsters Union, Stern explained that the company was having financial problems and that it needed some concessions from the union in terms of work rules, or in terms of having work done by outside contractors. The precise nature of the dispute is not clear to either of us but, in any event, it [is] clear that the following events occurred. Stern explained that his clients, whose names he did not give requested that he give $5,000 to O'Farrell *so that O'Farrell would "back-off" from his position opposing any concessions.* (Emphasis added.)

The testimony of Assistant United States Attorney Robert E. Welsh, Jr., during the September 26, 1985, hearing is to the same effect:

> Mr. Stern told us that he had represented a client, and it is my memory that he said Frankford-Unity, Incorporated, as a labor lawyer. And that this client was some sort of trucking company that had a labor problem. It was represented by Teamsters Local 500. This is in 1980 that this labor problem occurred. The labor problem dealt with a dispute over work rules in that—or job security might be a better way to say it—in that the company wished to farm out certain work. I don't know what kind of work, we did not get into that. But the point is that the Teamsters 500 was resisting, claiming and arguing that its employees or its members were entitled to the work. This is not an uncommon type of labor dispute.
>
> *At this point, according to Mr. Stern, his clients developed the idea of attempting to influence a [sic] O'Farrell with a payment of some form of consideration.* (Emphasis added.)

N.T. September 26, 1985, at 15.

At the hearing Respondent characterized his discussion with Frankford Quaker's representatives concerning the payment as follows:

> Well, they cast around for something to do and in a discussion with me, they said, if you can't help us by discipline and fighting them, and we're paying you this retainer, and more than the retainer sometimes, we are going to have to take another tack. We are going to have to do something else. There was discussion about—I don't remember the words or the give and take, but they said something to the effect, *we want to see if paying him softens his attitude.* (Emphasis added.) N.T. September 26, 1985, at 141.

From the foregoing it is clear that the purpose of the payment to O'Farrell was to influence him in his capacity as President of Local 500 and that Respondent was well aware of that fact. O'Farrell's initial unwillingness to cooperate serves as additional evidence of Respondent's full appreciation of the character of the transaction. The impact of Respondent's self-serving testimony with regard to *his* intent as to the effect of the payment pales before the overwhelming evidence to the contrary. We conclude, therefore, that Respondent facilitated an attempt by Frankford Quaker to bribe O'Farrell.

Respondent's testimony establishes that he knew such a payment would be illegal and so informed his client: "I said, don't do it, it's against the law. I said, I can't get involved in it." N.T. September 26, 1985, at 87. As a seasoned labor attorney, Respondent would have been familiar with section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, which provides in pertinent part:

> (a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce *with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.*

29 U.S.C. § 186(a) (emphasis added).[7]

Respondent was reluctant to accede to Frankford Quaker's demands; his scruples, however, were overcome by his desire to keep an important client. Respondent described his motivation as follows:

I have thought in my own mind there were two pressures. One was to maintain an advance of position, where I was trying to build the labor law practice at the firm. It was a fast track. I was charged with going out and hustling business, trying to do that sort of thing. I was pressed by the client because he said, you know, somebody else will do it if you don't. I would lose the

---

7. Prior to 1984, subsection (d) of section 302 provided that willful violation of the section was a misdemeanor punishable by a fine of up to $10,000 and/or imprisonment for up to one year. In 1984 subsection (d) was amended to provide that a payment violative of section 302 in excess of $1,000 is a felony punishable by a fine of up to $15,000, or imprisonment for up to five years, or both. 29 U.S.C. § 186(d).

client. And I was not right. I was weak. I should have said, well, then get yourself another lawyer. Get yourself another lawyer. I have never done anything like it before, never since, and if I had some—I thought I was intimate with these guys at Frankford Quaker. I thought I was solid with them. I thought that, you know, I was in an ascending position with the law firm. N.T. September 26, 1985, at 145.

■■■■■ From the foregoing evidence it is clear that Respondent knew he was being requested to violate the law and made a deliberate decision to do so rather than suffer what he perceived as a setback to his career. His ethical judgment was compromised by purely selfish financial considerations. On this record we must conclude that Respondent committed a serious breach of the Disciplinary Rules, violating DR 1–102(A)(3), which prohibits an attorney from engaging in illegal conduct involving moral turpitude;[8] DR 1–102(A)(6), which prohibits an attorney from engaging in other conduct which adversely reflects on his fitness to practice law; and DR 7–102(A)(7), which prohibits an attorney from counselling or assisting a client in conduct the attorney knows to be illegal or fraudulent.[9]

**8.** In our recent decision in *Office of Disciplinary Counsel v. Simon*, 510 Pa. 312, 507 A.2d 1215 (1986), this Court defined "moral turpitude" as " '... anything done knowingly contrary to justice, honesty, principle, or good morals.' " *Id.*, 510 Pa. at 320, 507 A.2d at 1220, *quoting Muniz v. State*, 575 S.W.2d 408, 411 (Tex.Civ.App.1978).

**9.** We do not agree with the Office of Disciplinary Counsel that a violation of DR 1–102(A)(4), which prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation, is established by the record. We recently interpreted that rule in *Office of Disciplinary Counsel v. Simon:*

> Although there is, in the broadest sense, dishonesty involved in every crime, we do not (nor did the Board) find that respondent's conduct involved dishonesty, fraud, deceit, or misrepresentation. To charge respondent with a violation of this rule under the facts presented in this case would be to make this rule too broad and all encompassing. The rule should be construed in its normal sense and "dishonesty" should not be taken out of context. Rather, it should be considered as it is commonly associated with those violations involving theft, misappropriation, etc. *See, e.g., Office of Disciplinary Counsel v. Lewis*, 493 Pa. 519, 426 A.2d 1138 (1981). 510 Pa. at 320 n. 7, 507 A.2d at 1219–1220 n. 7.

■ Having ascertained that Respondent has committed multiple serious violations of our Disciplinary Rules, we must now determine the appropriate discipline to be imposed. It should be noted first that disciplinary sanctions are not primarily designed for their punitive effects. *Office of Disciplinary Counsel v. Tumini,* 499 Pa. 284, 288, 453 A.2d 310, 312 (1982). Rather, as explained in *Office of Disciplinary Counsel v. Keller, supra:*

> The primary purpose of our system of lawyer discipline is to protect the public from unfit attorneys and to maintain the integrity of the legal system. *See In re Oxman,* 496 Pa. 534, 437 A.2d 1169 (1981), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2240, 723 L.Ed.2d 849 (1982); *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981); *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 425 A.2d 730 (1981). Disciplinary procedures have been established as a catharsis for the profession and a prophylactic for the public. *Office of Disciplinary Counsel v. Lewis, supra* 493 Pa. at 528, 426 A.2d at 1142.

*Id.,* 509 Pa. at 579, 506 A.2d at 875.

In addition to protecting the public, it is our responsibility to seek to preserve public confidence in the legal profession and the judicial system. *See Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 527, 426 A.2d 1138, 1142 (1981).

The public position of one who is a member of the legal profession is one of great responsibility. Integrity and the exercise of good faith in an attorney's professional

The common element in dishonesty, fraud, deceit and misrepresentation is deviation from the truth, as is illustrated by our prior disciplinary decisions. *See, e.g., Office of Disciplinary Counsel v. Wittmaack,* 513 Pa. 609, 522 A.2d 522 (1987) (failure to inform clients of conflicts of interest; fabrication of evidence; false testimony); *Office of Disciplinary Counsel v. Tumini,* 499 Pa. 284, 453 A.2d 310 (1982) (false swearing before grand jury); *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 425 A.2d 730 (1981) (filing sworn pleading known to be false); *Office of Disciplinary Counsel v. Walker,* 469 Pa. 432, 366 A.2d 563 (1976) (failure to inform client of adverse influences and conflicting interests); *Berlant Appeal,* 458 Pa. 439, 328 A.2d 471 (1974) (attempted solicitation of perjury); *Montgomery County Bar Association v. Hecht,* 456 Pa. 13, 317 A.2d 597 (1974) (false swearing). We find that element absent from Respondent's conduct.

engagements are essential for the protection of the public, the courts and the profession itself. It must be fully appreciated that each member of the bar is an officer of the Court. Consequently, it is the solemn duty of the judiciary to insure that the proper standing of its officers is preserved. *See Johnson Disbarment Case,* 421 Pa. 342, 345, 219 A.2d 593, 595 (1966); *In re Davies,* 93 Pa. 116, 122 (1880).

*Matter of Leopold,* 469 Pa. 384, 392, 366 A.2d 227, 230–231 (1976) (footnote omitted).

Rule 204 of the Rules of Disciplinary Enforcement specifies six types of discipline ranging from private informal admonition by Disciplinary Counsel to disbarment by this Court. Pa.R.D.E. 204(a). The nature of the sanction of disbarment was recently described in our decision in *Office of Disciplinary Counsel v. Keller, supra:*

Disbarment is an extreme sanction which must be imposed only in the most egregious cases, *Office of Disciplinary Counsel v. Kissel, supra; Matter of Leopold,* 469 Pa. 384, 366 A.2d 227 (1976), because it represents a termination of the license to practice law without a promise of its restoration at any future time. It has been deemed appropriate where the misconduct involves the types of breach of trust exhibited in this case. As noted in *Johnson Disbarment Case,* 421 Pa. 342, 219 A.2d 593 (1966):

It is the duty of the courts to maintain the integrity of the Bar and to see that courts and its members "do not fall into disrepute with the general public through the unprofessional or fraudulent conduct" of attorneys (*Forman's Case,* 321 Pa. 47, 184 A. 75) [1936]. "The power of a court to disbar an attorney should be exercised with great caution, but there should be no hesitation in exercising it when it clearly appears that it is demanded for the protection of the public. The court by admitting an attorney to practice endorses him to the public as worthy of confidence in his professional

relations, and if he becomes unworthy, it is its duty to withdraw its endorsement...."

*Johnson Disbarment Case, supra* 421 Pa. at 345–46, 219 A.2d at 595 (citation omitted).

*Id.*, 509 Pa. at 586–87, 506 A.2d at 879.

Having fully considered Respondent's serious transgressions against our standards of conduct for attorneys, we are satisfied that disbarment is the only appropriate remedy. Respondent's actions represent a dual injury to the public. First, motivated solely by pride and greed, he permitted himself to be corrupted by his own client, discarding his proper role as legal advisor and becoming a mere conduit for effectuating his client's illicit intentions. Second, himself corrupted, he succeeded, after repeated efforts, in corrupting a labor leader and thereby disrupting proper labor-management relations in violation of federal law. Such conduct will not be countenanced by this Court.

As the United States Supreme Court stated in *Ex Parte Wall*, 107 U.S. 265, 274, 25 S.Ct. 569, 576, 27 L.Ed. 552 (1882): "Of all classes and professions, the lawyer is most sacredly bound to uphold the laws. He is their sworn servant; and for him, ... argues recreancy to his position and office.... It manifests a want of fidelity to the system of lawful government which he has sworn to uphold and preserve." Where one who has sworn to uphold the law actively conspires to breach it, his fitness to practice is unquestionably destroyed.

*Office of Disciplinary Counsel v. Campbell*, 463 Pa. 472, 483, 345 A.2d 616, 622 (1975), *cert. denied*, 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976).

*Accord, Office of Disciplinary Counsel v. Casety*, 511 Pa. 177, 182–183, 512 A.2d 607, 610 (1986). Respondent has grossly abused the privileges entrusted to him and has debased not only himself but also the entire Bar of this Commonwealth, and his continued practice would be inimical to the public interest.

In his pleadings submitted to this Court Respondent has attempted to mitigate the severity of his misconduct. Re-

spondent emphasizes his outstanding success as a labor attorney and his otherwise unblemished disciplinary record. He also points to his contrition and his cooperation with federal law enforcement officials. In addition, Respondent stresses his active participation in professional, community and religious programs in the Philadelphia area. Finally, Respondent details the economic hardship, loss of social and professional standing and strain on his health and family life he has endured in the wake of his own misbehavior. We find that these factors do not offset the seriousness of Respondent's disciplinary violations or support his contention that he remains fit to practice law. As to Respondent's much emphasized cooperation with the federal authorities, the record reflects that he made his admissions only after being confronted by federal law enforcement officials aware of his misconduct. Cooperation at that point was clearly in his own self-interest. The same is, of course, true with respect to the subsequent disciplinary proceedings. We also note that the stipulations into which Respondent entered, while admitting misconduct, were hardly a model of candor, and attempt to paint as favorable a picture as possible under the circumstances. Respondent's involvement in professional, civic and religious activities, while laudable, is not relevant to our basic inquiry, Respondent's fitness to practice law in this Commonwealth. Moreover, without denigrating Respondent's extracurricular endeavors, we note that such activities are widely employed as a means of professional advancement. Finally, as to the disastrous personal consequences of Respondent's well-publicized misconduct, we must conclude that pleas for sympathy must not obscure this Court's responsibility to protect the public from unscrupulous lawyers. Respondent's downfall is entirely of his own making and, being the product of a deliberate decision to violate the law, is well-deserved.

For all of the above reasons, we have determined that Respondent must be disbarred from the practice of law in this Commonwealth. Accordingly, the Rule to Show cause is made absolute and Respondent Peter M. Stern is hereby

disbarred. It is further ordered that he shall comply with Rule 217, Pa.R.D.E., and pay all costs of these proceedings.

PAPADAKOS, J., joins in this opinion and files a concurring opinion.

PAPADAKOS, Justice, concurring.

I join the majority opinion, but write separately to express my personal dismay in the fate that has befallen Respondent as the result of his misconduct. His illustrious background and prominence in the legal community serve to magnify his ethical breaches. It is entirely appropriate to expect the most meticulous adherence to ethical standards from those with exceptional ability. Such attorneys should serve as models for the other members of the Bar and as public symbols of the highest professional ideals. When a member of the elite, such as Respondent, debases himself and violates the law for sheer personal gain, public confidence in the legal profession is destroyed.

Respondent has no right to expect less than disbarment.