## In re Anonymous No. 66 D.B. 84

Disciplinary Board Docket no. 66 D.B. 84.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

GILARDI, *Member,* May 29, 1992—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## HISTORY OF PROCEEDINGS

On September 7, 1984, the Supreme Court of Pennsylvania ordered that respondent be immediately transferred to disability inactive status pursuant to Rule 301(e), Pa.R.D.E. The order also halted all disciplinary proceedings against respondent because of his incapacitation.

On April 29, 1988, the Supreme Court ordered respondent to remain on inactive status, but authorized the investigation and prosecution of all disciplinary matters involving respondent. The Supreme Court order was issued in response to a June 11, 1987, capacity petition filed by the Office of Disciplinary Counsel and the corresponding October 13, 1987, report and recommendation of the Disciplinary Board.

On July 23, 1990, the Office of Disciplinary Counsel filed a petition for discipline of respondent.

On September 26, 1990, the Disciplinary Board authorized the scheduling of a hearing on the matter later than the 60-day limit provided by section 89.7, Disciplinary Board Rules.

Respondent filed an answer to the petition for discipline on October 26, 1990. In his answer, respondent raised the issue of his mental capacity at the time of the misconduct, and stated that he suffered from a severe manic

depressive disorder which had rendered him incapable of controlling his behavior.

On October 26, 1990, the parties entered into detailed factual and evidentiary stipulations. Respondent conceded that the facts upon which the two-part petition for discipline was based were true, and attested to the veracity of petitioner's incriminating documentary evidence.

The matter was referred to Hearing Committee [    ], which was chaired by [    ], and included [    ], Esquire, and [    ], Esquire. The committee held a hearing on the matter on November 13, 1990.

The Office of Disciplinary Counsel filed a brief to the hearing committee on December 20, 1990. Petitioner requested that respondent be disbarred from the practice of law, and that his mental infirmity not be considered in mitigation of his misconduct.

Respondent filed a brief to the hearing committee on January 18, 1991. Respondent prayed that the committee find that petitioner had failed to prove misconduct, or that his mental condition be considered in mitigation should it be determined that his conduct was unprofessional.

The hearing committee filed its report on April 11, 1991, and recommended that respondent be suspended for a period of five years and required to prove his mental, emotional, physical, and academic fitness before being permitted to resume the practice of law.

The matter was adjudicated at the May 30, 1991, meeting of the Disciplinary Board of the Supreme Court of Pennsylvania.

## SUMMARY OF EVIDENCE

We adopt the detailed stipulations entered into by the parties and found in the appendix. The following summary of the evidence will clarify our discussion of the issues.

In the first charge of the petition for discipline, respondent is alleged to have commingled and converted the funds of an estate which he failed to account for and neglected.

In November 1983, respondent was retained by the children of [A] to handle their mother's small estate, whose assets were questionably outweighed by liabilities. A major asset of the estate was a $9,063.50 savings account held jointly in the names of the decedent and her daughter. The decedent's daughter withdrew the proceeds from this account and signed them over to respondent, who deposited the funds into a nonsegregated bank account he normally used to pay personal and business expenses. Respondent proceeded to use the [A] estate proceeds to satisfy his own personal obligations, and failed to take any meaningful action on behalf of the estate or account for the funds.

The second part of the petition for discipline also charges respondent with commingling and converting client funds and neglecting an entrusted legal matter. In April 1983, respondent filed individual petitions for Chapter 11 Bankruptcy on behalf of [B] and [C], and in June 1983 on behalf of [D].

Respondent filed a reorganization plan in September 1983, listing his anticipated fee of $3,250 as the only claim, which was due to come out of a debtor's fund once the plan was confirmed by the court. Respondent

also listed the receipt of $1,600 total in legal fees in April and June 1983.

No further action was taken on the matter until the November 1983 filing of an application to use cash collateral. In May 1984, respondent received the [B] $6,590.67 share of the cash collateral, from which he deposited $3,000 into his personal account and spent by May 31, 1984. Respondent deposited the remaining $3,590.67 into an escrow account, which was spent on behalf of the [B]. However, respondent failed to account for their remaining funds, or to take any further action on behalf of the [B].

In 1983, respondent was diagnosed as suffering from a manic-depressive condition known today as bipolar disorder. The treating psychiatrist prescribed lithium carbonate for respondent, but he failed to take the medication on a regular basis.

In July 1984, respondent was hospitalized at a [    ] Hospital for a prolonged period of time after he was picked up by the police. Again, a diagnosis of bipolar disorder was made.

Respondent is presently under the care of a psychiatrist and is cooperating fully with his treatment.

## DISCUSSION

There are three issues before the Disciplinary Board in the instant proceeding. The first question is whether respondent violated the Disciplinary Rules as charged. The next query is whether there are any mitigating factors which were present at the time of misconduct and which

can be linked to respondent's actions. The final consideration is the appropriate discipline to be imposed.

Respondent has acknowledged, and bank records support, petitioner's contention that respondent deposited all but $46 of the [A] estate funds into his own nonsegregated bank account, from which he withdrew the monies to satisfy personal and business obligations. Such brazen commingling and conversion of client funds is clearly an example of dishonest, fraudulent, and illegal conduct involving moral turpitude, in violation of D.R. 1-102(A)(3) and D.R. 1-102(A)(4).[1] Furthermore, the placement of entrusted funds into a non-identifiable bank account and failure to maintain records or provide an accounting for client monies violated D.R. 9-102(A)(2) and D.R. 9-102(B)(3).[2]

In addition to his commingling and conversion of the [A] funds, respondent failed to promptly pay or deliver the proceeds of the estate to the heirs, or to timely pursue the matter and bring it to a conclusion. This neglect of an entrusted legal matter is in violation of D.R. 6-101(A)(3).[3] Respondent's failure to surrender his client's property is a violation of D.R. 9-102(B)(4).[4]

---

1. D.R. 1-102(A)(3), dealing with illegal conduct involving moral turpitude; D.R. 1-102(A)(4), dealing with conduct involving dishonesty, fraud, deceit or misrepresentation.

2. D.R. 9-102(A)(2), dealing with funds belonging to a client; D.R. 9-102(B)(3), dealing with maintaining records of all funds of a client and rendering appropriate accounting to a client.

3. D.R. 9-102(B)(4), dealing with prompt payment or delivery to a client, as requested by a client, of the funds in the possession of the lawyer.

4. D.R. 6-101(A)(3), dealing with neglecting a legal matter entrusted.

The second charge in the petition for discipline also contains allegations of commingling and conversion of client funds and the failure to maintain adequate records or promptly surrender entrusted monies. As with the [A] case, bank records and respondent's own candid admissions demonstrate that respondent placed a portion of the receipts of the [B] monies into a nonsegregated account which he then drew upon to satisfy personal obligations. The commingling and conversion of the [B] collateral funds is misrepresentative, deceitful conduct involving moral turpitude, in violation of D.R. 1-102(A)(3) and D.R. 1-102(A)(4).

Respondent's deposit of client funds into a nonsegregated account and his subsequent failure to account for those monies violated D.R. 9-102(A)(2) and D.R. 9-102(B)(3). Respondent's failure to promptly pay his client the converted funds to which the client was entitled violated D.R. 9-102(B)(4).

Finally, we note that respondent failed to conclude the [B] bankruptcy case. Although respondent's conduct technically violated D.R. 6-101(A)(3), since it constituted the neglect of an entrusted legal matter, we note, as did the hearing committee, that this conduct occurred at a time when respondent was in the throes of his mental illness.

According to Pennsylvania case law, the existence of psychiatric infirmity may mitigate attorney misconduct. In order for a psychiatric condition to be considered in a disciplinary proceeding, an expert witness must establish the existence of a causal connection between the disorder and the unprofessional conduct. *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989).

It is agreed by the parties that respondent had been diagnosed in 1983 by Dr. [E] as suffering from a manic-depressive disorder. At the time of diagnosis, Dr. [E] prescribed lithium carbonate for respondent, which he failed to take on a regular basis. (Stipulations at 15.) It was further agreed by the parties that respondent was admitted to the psychiatric unit of the [   ] Hospital on July 7, 1984, after being picked up by the police at some unknown location, and that he remained an in-patient at a [   ] hospital through at least July 27, 1984. (Stipulations at 13.) We also note that respondent was transferred to disability inactive status by the Pennsylvania Supreme Court on September 7, 1984, pursuant to his certificate of admission of disability. The only question before this board is whether respondent was suffering from psychiatric incapacity at the time the misconduct occurred.

At the hearing on November 13, 1990, two psychiatrists testified about respondent's manic-depressive disorder and their treatment of respondent. Although neither of the psychiatrists were able to pinpoint respondent's psychological state on a specific given date, a point of contention according to the Office of Disciplinary Counsel, the physicians were able to connect the respondent's bipolar disorder with his misconduct. Dr. [E] testified that people with bipolar disorder experience certain cycles during which they may "often get involved unwisely in situations which may cause disaster for them.... There is ... substantial impairment in their ability to function in their usual social and vocational activities." The psychiatrist also explained that excessive spending is a symptom of bipolar disorder. Dr. [E] also testified that he had seen respondent a total of seven times between April 1983 and March 1984, and

noted a slight improvement in his condition, although respondent had refused to see him from June 1983 to January 1984 because of a mistaken belief he was cured. (Denial is a crucial component of bipolar disorder.)

Dr. [F] testified that respondent suffered from bipolar disorder, and became a patient of his in October 1986. Dr. [F] now sees respondent about four times a year. Dr. [F] also testified that it is consistent with the nature of the disease and his knowledge of respondent to conclude that respondent was experiencing the cycles described by Dr. [E] in 1983 and 1984.

The testimony of Doctors [E] and [F] unequivocally established that the respondent's psychiatric condition was a factor in inducing his professional misconduct. Dr. [F] testified that respondent's judgment was severely impaired because of his illness, that respondent had no capacity to prevent himself from behaving in an unethical way, that respondent's judgment was so poor that he could not control his unethical conduct, that respondent did not have the ability to conform because of his illness, and that respondent did not experience an appreciable period of normalcy, if any, during the relevant time periods involved in this case. Dr. [F] testified that as a result of his illness, respondent believed that it was not wrong to take and misuse money.

Dr. [G] offered testimony which essentially corroborated, not refuted, that proffered by the other two psychiatrists.

Based on the testimony of the expert witnesses concerning the nature of respondent's psychiatric condition, their statements about their treatment of respondent, and

the fact that the behavior exhibited by respondent during the time of the misconduct was consistent with and a result of his bipolar disorder, we conclude that the *Braun* standard has been satisfied. Respondent's psychiatric impairment at the time of his misconduct is, therefore, a mitigating factor to be considered in ascertaining the appropriate disciplinary sanction.

The correct measure of discipline will protect the interests of the public and maintain the integrity of the bar. *Office of Disciplinary Counsel v. Stern,* 515 Pa. 68, 526 A.2d 1180 (1987). Respondent commingled and converted client funds and proceeded to spend the money he had illegally garnered from clients during a time when he was afflicted with bipolar disorder.

Of critical importance is the fact that excessive spending is a symptom of the disease respondent was suffering from at the time the misconduct occurred. Although respondent's insatiable appetite for spending in no way excuses his action, we believe it is a factor we must note so as to distinguish the instant case from others involving attorney commingling and conversion. Because respondent's judgment was severely impaired at the time of the appropriation, a fact which also resulted in his neglect of client matters, his conduct must be examined in a different light. We, therefore, find that a suspension of two and one-half years from the practice of law, retroactive to the date respondent was placed on disability status by Supreme Court order, will adequately protect the interests of the public and the bar by recognizing both the seriousness of respondent's Disciplinary Rule violations and the role his psychiatric impairment played in his misconduct.

## RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent be suspended from the practice of law for a period of two and one-half years, retroactive to September 7, 1984.

It is further recommended that the court direct that respondent pay all the necessary expenses incurred in the investigation and prosecution of this matter pursuant to Rule 208(g), Pa.R.D.E.

Board Members Eckell, Hill, Leonard and Sloane did not participate in the adjudication.

## ORDER

And now, May 29, 1992, upon consideration of the report and recommendations of the Disciplinary Board dated April 21, 1992, it is hereby ordered that [respondent] be and he is suspended from the bar of this Commonwealth for a period of two and one-half years, retroactive to September 7, 1984.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

## APPENDIX

### *Stipulations*

Now comes the Office of Disciplinary Counsel through [ ], Esq., acting chief disciplinary counsel, and respondent, through his counsel, [H], Esq., and enter the following stipulations pursuant to Board Rule §89.131:

## Stipulations of Facts

Parties to this disciplinary proceeding stipulate that the following facts are true:

### Charge I ([A] Estate Matter)

(1) The Office of Disciplinary Counsel of the Disciplinary Board is vested with authority to investigate and prosecute charges involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania, drawing its authority from the Pennsylvania Rules of Disciplinary Enforcement and Board Rules of the Disciplinary Board of the Supreme Court of Pennsylvania.

(2) [Respondent] was born in 1949 and was admitted to practice law in the Commonwealth of Pennsylvania in 1979. His last known address is [      ].

(3) On September 7, 1984, upon consideration of respondent's certificate of admission of disability that he was suffering an incapacitation to practice law, the Supreme Court of Pennsylvania entered an order immediately transferring respondent to disability inactive status pursuant to Rule 301(e), Pa.R.D.E., ordering that all disciplinary proceedings against respondent be held in abeyance.

(4) On June 11, 1987, petitioner filed a petition with the Disciplinary Board seeking to determine, by medical examination of respondent, whether respondent had the capacity to aid in the defense of any disciplinary charges against him. After appropriate medical evaluation and consideration of a report and recommendation of the Disciplinary Board, dated October 13, 1987, the Supreme

Court of Pennsylvania entered its order dated April 29, 1988, which directed that respondent continue on inactive status but authorized the investigation and prosecution of all disciplinary matters against respondent to proceed.

(5) On October 3, 1983, [A] died intestate, while a resident of [   ] County, Pennsylvania. Sole heirs of her small estate were [I], her son, and a daughter, [J].

(6) [I] and [J] retained respondent to represent them in handling their mother's estate shortly after her death. On or about November 9, 1983, [I] and [J] were appointed administrators of the [A] estate, estate no. [   ], in [ . ] County.

(7) The assets of the estate were very limited and respondent indicated to [I] and [J] during or about early November 1983 that the debts of the estate might exceed its assets. One significant asset of the estate was savings account no. [   ] at the [K] Bank, N.A., at [   ], Pennsylvania, which account was held jointly in the names of [A] and [J], whose married name was [J]. [J] was a joint owner of the account as a convenience for her mother, [A].

(8) On or about November 18, 1983, [J] closed savings account no. [   ] and [K] Bank issued its cashiers check, no. [   ], in the amount of $9,063.50 payable to [A] or [J], which amount represented the entirety of funds in [J's] savings account on the date the account was closed.

(9) [J] and [I] promptly took check no. [   ] to the law office of respondent. [J] endorsed it by signing her maiden name and delivered it to respondent's secretary, [L], who provided [J] with a receipt annotated to indicate that the check proceeds were to be held "in trust until

settlement of [A] estate." One purpose of the delivery of the proceeds of the savings account was to allow payment of bills the estate owed to the [M] Funeral Home for funeral expenses and to [N] Associates for medical services rendered to [A].

(10) Upon receipt of check no. [    ] respondent deposited it into his account no. [    ] at the [K] Bank, denominated "[Respondent], Esq., Attorney at Law." Account no. [    ] was not a proper trust account and contained funds belonging to respondent and was normally used to receive his personal funds and to pay his personal and business expenses.

(11) From November 9, 1983, to January 20, 1984, respondent wrote only two checks on his attorney account for payment of administrative expenses of the [A] estate or otherwise relating to the estate, as follows:

(a) Check no. [    ], dated November 9, 1983: $28, payable to the register of wills.

(b) Check no. [    ], dated November 18, 1983: $18, payable to the [    ] Law Journal.

(12) At no time during the period from November 18, 1983, to March 9, 1984, did the [K] attorney account of respondent have a balance equal to or greater than the amount he was then responsible to hold in trust for the [A] estate. On January 23, 1984, the total amount in the attorney account of respondent was $3.60. During the period from January 23 to February 17, 1984, the highest balance in the attorney account was $152.35 and the attorney account was overdrawn on 14 separate days in that period.

(13) In early February 1984, [I] contacted respondent to ask that the [M] Funeral Home bill be paid promptly from the [A] estate funds respondent was to hold in trust. After December 14, 1983, the attorney account did not contain funds of the [A] estate sufficient to pay the funeral home.

(14) On or about February 21, 1984, respondent obtained a personal loan, no. [   ], from the [O] Co. of [   ], Pennsylvania in the amount of $3,514.72 and deposited the proceeds of that loan into his attorney account on February 2, 1984.

(15) On February 21, 1984, respondent wrote check no. [   ] on his attorney account, payable to the [M] Funeral Home in the amount of $3,267.30, and thus paid the obligation of the [A] estate. Such payment was made from funds of respondent in the attorney account and not from the [A] estate funds entrusted to him on November 18, 1983.

(16) During the period from December 1983 until June 1984, respondent failed to pay all, or any portion, of the other debts and expenses of the estate, including substantial medical bills from [N] Associates of [   ] for medical services that had been rendered to [A] during her final illness. Respondent also failed during that time period to act to move the [A] Estate to a prompt and proper conclusion.

## Charge II (The [B] Milk Funds)

(17) During a period of time prior to April 1983, respondent counselled [B], his brother, [C], and their mother, [D], about financial problems they were experiencing run-

ning their family dairy farm in [ ], [ ] County, Pennsylvania.

(18) In April 1983, respondent filed individual petitions for Chapter 11 bankruptcy relief for [B] and [C] and on June 9, 1983, for [D] and for their partnership "[B] Farm," in the U.S. Bankruptcy Court for the [ ] District of Pennsylvania.

(19) On September 30, 1983, respondent filed a plan of reorganization for the [Bs] and their partnership. Article II of the plan, Classification of Claim, listed respondent's anticipated legal fees of $3,250 as the only Class One claim. Article V, Means, proposed that the Class One claim for fees would be paid out of a fund which the debtors would pay into court upon confirmation of the plan. The income and expense statement filed contemporaneously with the plan reported the payment of $500 in attorney fees to respondent in April 1983 and of $1,100 in June 1983.

(20) From September 30, 1983, until early June 1984, there were no meetings or hearings to cause the court finally to approve or reject the plan of reorganization.

(21) During October and November 1983 respondent and the [Bs] determined that the only chance for a long-term solution of the problems of the [B] dairy farm was to increase their income from the sale of milk. Respondent agreed that the size of the diary herd should be increased if such were possible.

(22) On November 18, 1983, respondent filed, for the [Bs], an application to use cash collateral, which stated:

(a) The [B] family had been in the business of milk production and sale continuously for 50 years.

(b) The [Bs] were a party to loan agreements with the Farm Home Administration which held a security interest by way of a "milk assignment."

(c) Upon receipt of notice of the [Bs'] Chapter 11 petition, Interstate Milk Producers Cooperative, a milk wholesaler, had begun to retain the amounts due FmHA each month under the "milk assignment."

(d) At the time of the application, Interstate Milk Producers Cooperative held a total of $10,246.39, a portion of which the [Bs] needed for operation of their dairy farm.

(e) The [Bs] asked entry of an order authorizing them, inter alia, to utilize the $10,246.39 in "cash collateral" of the FmHA for the purposes of paying their FmHA debt, "paying taxes, purchasing feed, purchasing additional livestock, and paying expenses" of the [B] dairy farm.

(23) After a series of negotiations with counsel for the U.S. Department of Agriculture and Interstate Milk Cooperative, respondent and [P], Esq., representing the U.S. Department of Agriculture, stipulated to entry of an order releasing the cash collateral and distributing 55 percent of the cash collateral to the United States of America and 45 percent of it to the debtors, the [Bs]. On April 17, 1984, Bankruptcy Judge [Q] ordered Interstate Milk Producers to turn over the cash collateral funds in its possession: 55 percent to the USA and 45 percent to respondent and the [Bs].

(24) On April 18, 1984, respondent opened a personal account in his name and that of his secretary, [L], no. [ ], in the [R] Bank in [ ] County, Pa. On May

8 and 9 and May 15, 1984, the personal account was overdrawn.

(25) On April 18, 1984, respondent also opened an escrow account, no. [    ], in the [R] Bank, [    ] County, Pa.

(26) On or about May 15, 1984, respondent received the [Bs'] 45 percent distribution share of the cash collateral in the form of check no. [    ] of Interstate Milk Producers Cooperative, dated May 11, 1984, in the amount of $6,590.67 and payable to "[B] Farm and [Respondent], Esq."

(27) Respondent caused [B] to endorse the cash collateral distribution check and then made a split deposit of its proceeds.

(a) Respondent deposited $3,000 of the check in his [R] personal account, no. [    ], on May 15, 1984. All but $200 of the $3,000 was spent for respondent's personal benefit by May 31, 1984.

(b) On May 15, 1984, respondent deposited the balance of the proceeds, $3,590.67, in the [R] escrow account, no. [    ].

(28) During the time period from May 15, 1984, to June 5, 1984, respondent drew checks on the [R] escrow account for the benefit of the [B] farm as follows:

| Date Made | Check No. | Payee | Amount |
| --- | --- | --- | --- |
| May 15 | [    ] | [B] | $870 |
| May 15 | [    ] | [S] | 200 |
| June 5 | [    ] | [B] | 650 |
|  |  |  | 1,720 |

(29) On June 6, 1984, the amount of [B] farm funds in the [R] escrow account with which respondent was entrusted was $1,870.67, and the balance of the [R] escrow account was $2,012.67.

(30) In late June or early July 1984, respondent became unavailable to [B] as his office was closed. At that time respondent ceased all work on the [Bs'] financial problems and bankruptcy. Respondent has failed to submit a formal accounting for all of the money which he received on behalf of the [Bs]. The [Bs] did receive the amount of $1,012 from respondent's escrow account when it was closed out, by court order, in October and November 1984.

(31) [T], Esq., is an attorney-at-law duly licensed to practice in the Commonwealth of Pennsylvania, with offices at [    ], Pa. He is a fully qualified expert concerning bankruptcy law. If called, [T] would testify that the U.S. Bankruptcy Court, [    ] District of Pennsylvania, has no local rules at the present time, and had none during the years 1983 and 1984 with impact upon the issues of lawyers' fees and fee payments to lawyers representing parties to bankruptcy proceedings were, and are, contained in 11 U.S.C. §§ 327 through 331. If called Attorney [T] would testify that the proper procedure in obtaining a fee in a Chapter 11 bankruptcy case is to submit an application and obtain a Bankruptcy Court order prior to taking a fee. After a review of the pertinent court documents, Attorney [T] would testify that no application was submitted in May or June 1984 by [respondent] authorizing him to receive a fee for services rendered. Attorney [T] would testify further that it would be legally improper

for [respondent] to have taken attorney fees without having submitted an application for payment of fees.

(32) During 1984 [U] served as an investigator for the Office of Disciplinary Counsel of the Disciplinary Board of the Supreme Court, with his office located in [    ]. [U] was assigned to investigate the circumstances under which complaints have been received concerning [respondent] in June 1984. On June 28, 1984, [U] personally spoke to respondent at his law office for approximately ten minutes. At that time [respondent] demanded to know why [U] was there, demanded to make a copy of his credentials, demanded that [U] return with the Federal Bureau of Investigation, demanded that [U] help him as an officer of the court and demanded that [U] return the following day at 11 a.m. [Respondent] further demanded to know who had sent [U] and [U] attempted to advise him of the concerns of the Office of Disciplinary Counsel about [respondent's] clients and referred specifically to the [A] estate and [respondent's] refusal to return the file and estate funds to [I]. The respondent gave [U] a copy of a letter dated June 28, 1984, which had been prepared for mailing to [V], Esq., which letter referred to a break-in at [respondent's] office and stated that he would not release the [A] estate file or distribute any funds to [I]. Within approximately one-half hour after [U] spoke to [respondent], [U] observed [respondent] driving away from his law office. [U's] later investigations led him to believe that [respondent] thereafter never returned to the location of his law office.

(33) When [U] spoke to respondent personally on June 28, 1984, he found [respondent] to be in an extremely

agitated state and found it impossible to converse with [respondent] in a rational and coherent manner. [U] did agree to [respondent's] request that [U] return to [respondent's] office at 11 a.m. on June 29, 1984.

(34) While in [respondent's] office on June 28, 1984, [U] noted that the office was in a general disarray with furniture placed haphazardly and files and papers were scattered about the office in apparent disorder. During that visit, [U] also noticed that respondent's mailbox was located in the hallway of the building and that the mailbox was literally stuffed with what appeared to be correspondence relating to his practice.

(35) On July 9, 1984, [U] determined that [respondent] was admitted to the [    ] Hospital, psychiatric unit, in [    ], Pennsylvania, on July 7, 1984, after the police had picked the respondent up at some unknown location and, at [respondent's] request, had taken him to that hospital.

(36) [U] also reported that on July 12, 1984, the respondent was transferred to the [    ] Hospital in [    ], Pennsylvania where he remained, at least through July 27, 1984. While there he was under the treatment of Dr. [W], a psychiatrist. Respondent [    ] gave his consent for the staff at the [    ] Hospital to release information to the Office of Disciplinary Counsel concerning his condition. [U] subsequently spoke to Dr. [W] on July 13, 1984, and, on the same date, sent him a letter outlining the desire of the Office of Disciplinary Counsel to seek respondent's transfer to inactive status based on disability and then to seek the appointment of a conservator to make sure the respondent's clients were not prejudiced.

Dr. [W] was requested to seek [respondent's] consent and then to provide a written report of the respondent's medical diagnosis, his present condition, an estimate of the length of time he would remain hospitalized in Dr. [W's] opinion and when the respondent might be able to resume the practice of law. The respondent was found to have been in the [    ] Hospital on a voluntary basis.

(37) On July 16, 1984, [U] again spoke to Dr. [W], who had received [U's] letter of July 13, 1984, and discussed our request for a medical report with [respondent]. [Respondent] had expressed some reluctance in agreeing to a submission of the report as it might ultimately result in a conservator being appointed to handle his legal affairs as related to his clients.

(38) On July 16, 1984, [U] was advised by [H], Esq., of [    ], Pa., that the respondent had retained him relative to the inquiries and actions contemplated by the Office of Disciplinary Counsel. The general circumstances of the respondent's situation and the concerns of the Office of Disciplinary Counsel were discussed with [H] and [H] indicated that he intended to meet with the respondent on July 18 or 19, 1984.

(39) On July 24, 1984, [U] spoke with [H] to confirm that he represented the respondent. [U] concluded from his conversation with [H] that [respondent] was reluctant to consent to Dr. [W] submitting a report on his condition and his ability to resume the private practice of law. Respondent's counsel also advised that [respondent] recognized the need to protect the legal interests of his clients. [H] advised [U] that the respondent would probably remain hospitalized for approximately two more months.

(40) Respondent had been diagnosed in 1983 by Dr. [E] as suffering from a manic-depressive disorder. Dr. [E] wrote a prescription for lithium carbonate for respondent at that time. Respondent did not thereafter take the medication on a regular basis.

(41) After respondent's hospitalization in July 1984 at [    ] Hospital, respondent was diagnosed as suffering severe manic disorder, which is now known as bipolar disorder.

(42) After July 1984, respondent, acting through his attorney, cooperated with counsel for the Office of Disciplinary Counsel in releasing his bank records and client files to both Disciplinary Counsel and the conservator appointed in September 1984 to take over his client files.

(43) Respondent was told by Disciplinary Counsel that if he was later found guilty of violations of the Pennsylvania Code of Professional Responsibility, the rules provide that it was possible that any disciplinary suspension may be made retroactive to the date of his suspension from practice under Rule 301(e), Pa.R.D.E.

*Stipulations Concerning Documentary Evidence*

(1) The parties stipulate that all dockets, papers and other materials filed with the U.S. Bankruptcy Court, [    ] District of Pennsylvania with regard to the bankruptcies of [B], [C], [D] and the [B] Farm may be introduced without necessity of original certification or authentication by a proper office of the court. Objections as to relevance and materiality are reserved.

(2) The parties further stipulate that the following letters contained in the files of [respondent], now in possession

of petitioner, relating to the [B] Bankruptcy matter may be introduced into evidence, by original or a copy, without further authentication or requirement that chain of custody be proven:

(a) March 7, 1984, letter of [respondent] to [P], Esq.

(b) March 7, 1984, letter of [respondent] to [B] Farm.

(c) March 21, 1984, letter of [respondent] to [P], Esq.

(d) March 26, 1984, letter of [respondent] to [P], Esq.

(e) April 2, 1984, letter of [respondent] to [X], Esq.

(f) April 13, 1984, letter of [respondent] to [P], Esq.

(g) April 19, 1984, letter of [respondent] to [B] Farm.

(h) April 30, 1984, letter of [respondent] to [X], Esq.

(i) May 15, 1984, letter of [respondent] to [Y].

Any objections as to relevancy or materiality are reserved.

(3) The parties stipulate that portions of a check register relating to [K] Bank, N.A. account [ ], covering activity on that account from November 21, 1983, until approximately December 13, 1983, may be introduced into evidence without necessity of production of the original of such book, authentication of the document, or presentation of evidence concerning chain of custody of such document. Any objections as relevancy or materiality are reserved.

(4) The parties stipulate that a composite exhibit constituting [K], N.A. cashiers check no. [ ] in the amount of $9,063.60 relating to closed savings account no. [ ] and a receipt, no. [ ], dated November 18, 1983, and signed by [L] evidencing receipt from [J] of $9,063.60 in trust for the [A] estate, may be introduced as evidence in this proceeding without necessity of authentication of

such documents, production of the originals or presentation of evidence concerning chain of custody of such documents.

(5) The parties further stipulate that a summary of account transactions prepared by the Office of Disciplinary Counsel concerning [R] Bank escrow account no. [    ] and documents supplied by [R] Bank regarding monthly statements, deposit items, checks, NSF notifications and other normal documentation concerning such account shall be admissible into evidence without necessity for identification or authentication of such records by officers of the [R] Bank and that such records, other than the summary prepared by the Office of Disciplinary Counsel, are records kept in the ordinary course of the banking business of [R] Bank. Any objections as to relevancy or materiality are reserved.

(6) The parties further stipulate that a summary of account transactions prepared by the Office of Disciplinary Counsel concerning [R] Bank Account no. [    ] in the name of [respondent] and [L] and documents supplied by [R] bank regarding monthly statements, deposit items, checks, NSF notifications and other normal documentation concerning such account shall be admissible into evidence without necessity for identification or authentication of such records by officers of the [R] Bank and that such records, other than the summary prepared by the Office of Disciplinary Counsel, are records kept in the ordinary course of the banking business of [R] Bank. Any objections as to relevancy or materiality are reserved.

(7) The parties further stipulate that a summary of account transactions prepared by the Office of Disciplinary

Counsel concerning [K] Bank, N.A., account no. [    ] denominated "[Respondent], Esq., Attorney at Law," and documents supplied by [K] Bank regarding monthly statements, deposit items, checks, NSF notifications and other normal documentation concerning such account shall be admissible into evidence without necessity for identification or authentication of such records by officers of the [R] Bank and that such records, other than the summary prepared by the Office of Disciplinary Counsel, are records kept in the ordinary course of the banking business of [R] Bank. Any objections as to relevancy or materiality are reserved.