**In re Anonymous No. 123 D.B. 90**

Disciplinary Board Docket No. 123 D.B. 90.

GILARDI, *Vice-Chairman,* October 8, 1992—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## HISTORY OF PROCEEDINGS

On November 21, 1990, the Office of Disciplinary Counsel filed a petition for discipline against respondent, docketed at No. 123 D.B. 90.

Respondent filed an answer to the petition for discipline on January 22, 1991, and admitted to the violations alleged by the Office of Disciplinary Counsel.

The matter was referred to Hearing Committee [    ], which was chaired by [    ], Esq., and included [    ], Esq. and [    ], Esq. The committee held a hearing on the matter on April 12, 1991.

On August 27, 1991, Hearing Committee [    ] filed its report on the matter, and recommended that respondent be suspended from the practice of law for one year and one day.

The matter was adjudicated at the September 27, 1991, meeting of the Disciplinary Board of the Supreme Court of Pennsylvania.

## FINDINGS OF FACT

We make the following findings of fact, based upon stipulations entered into by the parties and testimonial evidence offered by respondent:

(1) Petitioner, whose principal office is located at 300 North Second Street, Harrisburg, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid Rules.

(2) Respondent, [   ], Esq., was born in 1952, was admitted to practice law in the Commonwealth of Pennsylvania in 1981, and she can be currently reached at [   ].

(3) On February 16, 1978, [A], a widow died testate, a resident of [   ] County owning only real property located in [   ], Pennsylvania, and in [   ], Alabama.

(4) Decedent's home located in [   ], Pennsylvania, was destroyed by fire on or about October 27, 1983, and a homeowner's claim was submitted to [B] Insurance Co. in the amount of $11,500.

(5) During November 1983, respondent met with [C], decedent's son during which time she agreed to act as attorney for the estate and advised [C] that her fee would be $500. Respondent also advised [C] that she would arrange for the transfer of the names of each beneficiary to the deed to the decedent's real property located in Alabama.

(6) On January 27, 1984, the decedent's will was probated and letters testamentary were granted to [C].

(7) On January 27, 1984, an estate checking account was opened at [D] Bank, numbered [   ] and captioned "Estate of [A], Deceased, [C], Executor, c/o [Respondent], Attorney, [   ]" (hereinafter, "estate account").

(a) [C] had sole signatory authority over the estate account.

(b) Respondent maintained possession of the estate account checkbook and deposit slips, and arranged to receive all monthly statements and canceled checks.

(c) On about January 27, 1984, respondent deposited or caused to be deposited into the estate account, $11,500 received from [B] Insurance Co. as a result of settlement of the homeowner's claim.

(8) On about January 31, 1984, [C] met with respondent at her office at which time he endorsed approximately nine checks. Five of the checks were payable to heirs as a partial distribution from the estate in the amount of $1,700 each and the remaining checks were used for administrative purposes, including a check to respondent in the amount of $500 for her fee.

(9) By letter dated May 22, 1984, respondent was given a "10-day courtesy" period, from the Department of Revenue, by which to file an inheritance tax return for the [A] Estate.

(10) Respondent did not then file the inheritance tax return.

(11) By letter from the Department of Revenue dated June 21, 1984, directed to [C] with a copy to respondent, the executor was advised that an inheritance tax return had not been filed.

(12) On August 10, 1984, respondent filed or caused to be filed an inventory on behalf of the estate.

(13) On August 30, 1984, respondent filed or caused to be filed the inheritance tax return on behalf of the estate. The inheritance tax return reflected the estate as insolvent, with no inheritance tax due.

(14) [C's] purported signature was on both the inventory and the inheritance tax return.

(a) [C] did not sign these documents.

(b) [C] did not consent to respondent signing them and did not have knowledge of their filing.

(15) Thereafter, from August 1984 through November of 1984, respondent paid various legitimate estate expenses and as of November 1984, was entrusted with $2,379.50 of estate funds.

(16) By a check which cleared the estate account on March 5, 1985, respondent received $100 for "reimburse-

ment" of the title search in regard to the property located in Alabama.

(17) As of March 5, 1985, the balance in the estate account was $2,279.50.

(18) During July of 1986, respondent requested [C] to sign two estate checks totaling $2,380, which estate proceeds were purportedly to be used by respondent to pay an Alabama attorney for transferring to the beneficiaries' names the title to the Alabama property and to pay for all advertising costs associated with the transfer. Respondent was given the following checks:

(a) Check number 12, dated July 11, 1986 (clearing the estate account on July 15, 1986), payable to respondent in the amount of $1,180.

(i) Respondent deposited this check into her [E] account captioned "[Respondent] Inc." no. [    ].

(ii) Respondent used these proceeds for her own purposes.

(iii) The available balance in the estate account as of July 15, 1986, was $1,099.50.

(b) Check number 12, dated July 16, 1986 (clearing the estate account on July 16, 1986), payable to respondent in the amount of $1,200.

(i) Respondent deposited this check into her "[Respondent] Inc." account.

(ii) Respondent used these proceeds for her own purposes.

(iii) The balance in the estate account was insufficient to allow the check to clear.

(iv) On July 16, 1986, respondent deposited into the estate account a check in the amount of $102, payable to "[C], Executor" and drawn on respondent's "[Respondent] Inc.," account.

(v) This deposit enabled the check to clear the account.

(c) Respondent failed to have the beneficiaries' names transferred to the deed for decedent's property in Alabama.

(d) In fact, respondent's assertions to [C] were merely a ploy in order to convince him to sign the checks payable to her.

(19) Respondent thus misappropriated the entire remaining estate assets of $2,279.50.

(20) Between August 1986 and December 1986, respondent made various deposits of her own funds into the estate account and then drew checks therefrom for her own purposes.

(a) The following are the deposits made by respondent of her personal funds into the estate account:

(i) August 18, 1986, respondent deposited $1,400 in cash.

(ii) On November 24, 1986, respondent deposited $800.

(iii) On November 28, 1986, respondent deposited $1,200 comprised of:

(*a*) A $400 check drawn on respondent's [E] account captioned "[F]," numbered [    ];

(*b*) A $400 check drawn on respondent's [G] account captioned "[Respondent], Attorney at Law," numbered [    ], which check did not clear and thus was not credited to the estate account; and

(*c*) A check in the amount of $400 drawn on respondent's "[Respondent] Inc." account.

(iv) On December 3, 1986, respondent deposited $500 comprised of:

(*a*) A $250 check drawn on respondent's "[F]" account; and

(*b*) A $250 check drawn on respondent's "[Respondent] Inc." account.

(v) On December 4, 1986, respondent deposited $1,800 comprised of:

(*a*) A check in the amount of $600 drawn on respondent's "[Respondent] Inc." account;

(*b*) A $600 check drawn on respondent's "[F]" account; and

(*c*) A $600 check drawn on respondent's [E] account captioned "[H]" numbered [    ].

(vi) On December 12, 1986, respondent deposited $290 drawn on her "Attorney at Law" account.

(b) Respondent made the following disbursements, all to the benefit of herself, with the funds that she had deposited into the estate account.

(i) By estate check dated August 13, 1986, and clearing the estate account on August 15, 1986, respondent received $1,400.

(ii) By estate check dated November 20, 1986, and clearing the estate account on November 24, 1986, respondent received $780.

(iii) By estate check dated November 26, 1986, and clearing the estate account on November 28, 1986, respondent received $1,200.

(iv) By estate check dated December 2, 1986, and clearing the estate account on December 3, 1986, respondent received $500.

(v) By estate check dated December 2, 1986, and clearing the estate account on December 4, 1986, respondent received $850.

(vi) By estate check dated December 3, 1986, and clearing the estate account on December 4, 1986, respondent received $850.

(c) On each of the checks drawn from the estate account during this time period, respondent placed or caused to

be placed [C's] signature, without his knowledge, consent or authorization.

(d) As of January 5, 1987, the balance in the estate account was $2.

(21) On February 3, 1987, as a result of a service charge to the estate account in the amount of $2, the estate account was reduced to a zero balance.

(22) As of April 1987, the estate account was closed.

(23) In about May 1988, [C] discovered the theft of the estate funds.

(24) Thereafter, his attempts to contact respondent regarding the estate were futile.

(25) In late February or early March 1990, respondent received a letter from the Pennsylvania Client Security Fund indicating that [C] had filed a complaint with the fund for respondent's theft of estate funds.

(a) On about February 26, 1990, respondent telephoned [C].

(b) During that telephone conversation, respondent advised [C] that she had "moved" the money from the estate account because of "problems caused by her divorce," or words to similar effect.

(c) By letter dated March 5, 1990, respondent forwarded to [C] a certified check dated March 13, 1990, in the amount of $2,368.

(26) Respondent never transferred the names of the beneficiaries to the deed to decedent's property located in Alabama.

(27) By respondent's conduct as set forth in the foregoing paragraphs 3 through 26, inclusive, as to the period ending March 31, 1988, respondent has violated the following Disciplinary Rules:

(a) D.R. 1-102(A)(4)—dealing with a lawyer engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;

(b) D.R. 1-102(A)(6)—dealing with conduct that adversely reflects on a lawyer's fitness to practice law;

(c) D.R. 6-101(A)(3)—dealing with a lawyer neglecting a legal matter entrusted to the lawyer;

(d) D.R. 9-102(A)—requiring that all funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, be deposited in one or more identifiable bank accounts wherein no funds belonging to the lawyer or law firm shall be deposited;

(e) D.R. 9-102(B)(3)—requiring a lawyer to maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(28) By respondent's conduct as set forth in the foregoing paragraphs 3 through 26, inclusive, as to the period beginning April 1, 1988, respondent has violated the following Rules of Professional Conduct:

(a) RPC 1.3—"A lawyer shall act with reasonable diligence and promptness in representing a client."

(b) RPC 1.4(a)—"A lawyer shall keep a client informed about the status of a matter and promptly comply with reasonable requests for information."

(c) RPC 1.15(a)—"A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property...."

(d) RPC 1.15(b)—"A lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive...."

(e) RPC 8.4(c)—"It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

(29) At the time the misconduct occurred, respondent was attempting to end her marriage to a mentally ill man with whom she had incurred various business debts.

(30) Respondent's mishandling of the estate funds resulted from her attempts to keep her other businesses afloat by "borrowing" money from her law practice. (N.T. 17).

## CONCLUSIONS OF LAW

Respondent's aforementioned misconduct violated the following Disciplinary and Professional Conduct Rules:

(a) D.R. 1-102(A)(4)—which prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;

(b) D.R. 1-102(A)(6)—which prohibits a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law;

(c) D.R. 6-101(A)(3)—which prohibits a lawyer from neglecting a legal matter entrusted to the lawyer;

(d) D.R. 9-102(A)—which requires that all funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, be deposited in one or more identifiable bank accounts wherein no funds belonging to the lawyer or law firm shall be deposited;

(e) D.R. 9-102(B)(3)—which requires a lawyer to maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to the client regarding them;

(f) RPC 1.3—which requires a lawyer to act with reasonable diligence and promptness in representing a client;

(g) RPC 1.4(a)—which requires a lawyer to keep a client informed about the status of a matter and promptly comply with reasonable requests for information;

(h) RPC 1.15(a)—which requires a lawyer to hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property;

(i) RPC 1.15(b)—which requires a lawyer to promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive; and

(j) RPC 8.4(c)—which states that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

## DISCUSSION

Both petitioner and respondent admit that the instant proceedings stemmed from respondent's mishandling and misappropriation of estate funds totaling approximately $2,300. The preponderance of the evidence presented by the Office of Disciplinary Counsel clearly and satisfactorily proves that respondent did, in fact, engage in the alleged misconduct. *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986).

The only question before the Disciplinary Board, therefore, is the appropriate measure of discipline in light of respondent's transgressions and the mitigating circumstances surrounding her misconduct. As in any proceeding, the correct disciplinary sanction will protect both the interests of the public and the integrity of the bar. *Office of Disciplinary Counsel v. Stern,* 515 Pa. 68, 526 A.2d 1180 (1987). When ascertaining what such a sanction should be, we will consider the nature of the

respondent's misconduct and the circumstances surrounding the Rule violations.

As aforementioned, the instant case involves the misappropriation of client funds, a very serious act of misconduct. While we are mindful of the nature of respondent's unprofessional conduct, we are also cognizant of the need to review each case de novo and to decide each adjudication based on the totality of the facts. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983).

As noted by petitioner, Pennsylvania disciplinary case law on theft of client funds range from disbarment to the imposition of a private reprimand.

In fact, "the Office of Disciplinary Counsel is not taking the position that (respondent) should be disbarred ... the least discipline that should be imposed is suspension for one year and one day. That suspension would require (respondent) to petition for reinstatement back into the practice of law." (N.T. 21, 22).

The Hearing Committee recommends that respondent be suspended for one year and one day precisely for the reason stated by petitioner—that such a suspension would necessitate a showing of fitness to resume the practice of law. We are in agreement that suspending respondent from the practice of law for a period of one year and one day is the appropriate disciplinary sanction.

Although respondent has misused client funds, we are aware of the unusual circumstances surrounding her aberrational actions. The Hearing Committee heard noncontroverted testimony about respondent's extreme personal problems when the misconduct occurred. Respondent was involved in a marriage to a man with a brain chemical imbalance, which led him to develop uncontrollable paranoia and hallucinations, and resulted in his hospitalization, failure to maintain the businesses he had

opened, and eventual terrorizing of respondent. Respondent has since divorced this man and moved to [    ] where she has been working as a legal secretary.

Although respondent's personal problems in no way excuse her misconduct, we find that they do offer an explanation for her actions, and are a factor to be considered at the dispositional stage of disciplinary proceedings. We are convinced that respondent's conduct was the result of a unique factual situation, and that the correct measure of discipline will reflect that belief.

Suspension of respondent from the practice of law for a period of one year and one day will adequately safeguard the interests of the public and the bar, and reflect the seriousness of respondent's misconduct. Respondent will be required to file a petition for reinstatement in order to resume the practice of law in Pennsylvania which we believe will further protect the public and the bar.

## RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent, [    ], be suspended from the practice of law for a period of one year and one day. It is further recommended that the court direct that respondent pay all of the necessary expenses incurred in the investigation and processing of this matter pursuant to Rule 208(g), Pa.R.D.E.

Mr. Hill dissents and would recommend a six months' suspension.

Messrs. Schiller and Paris and Ms. Flaherty did not participate in the adjudication.

## ORDER

And now, October 8, 1992, upon consideration of the report and recommendations of the Disciplinary Board

dated February 4, 1992, it is hereby ordered that [respondent] be and she is suspended from the bar of this Commonwealth for a period of one year and one day, and she shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Messrs. Justice Larsen and Papadakos dissent and would enter a rule to show cause why respondent should not be disbarred.