## Montgomery County Bar Association *v.* Hecht, Appellant.

Argued May 4, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

*Neil E. Jokelson,* with him *Jokelson & Rosen,* for appellant.

*Jerome B. Nulty,* with him *Morris Gerber,* and *Clemens and Nulty,* for appellee.

OPINION BY MR. JUSTICE POMEROY, March 25, 1974:

Samuel J. Hecht, the appellant, is an attorney-at-law, duly licensed to practice at the bar of this Court and in the courts of Pennsylvania. A resident of Montgomery County, he has had a law office and been engaged in the practice of law in the borough of Cheltenham in that county since November of 1966.[1]  On Oc-

---

[1] Appellant graduated from an accredited Pennsylvania law school in 1950, passed the bar examinations and was admitted to the bar of this Court the same year. At the time of his admission to practice in the courts of Montgomery County on certificate of good standing at the bar of this Court, Hecht stated that he maintained his law office at Cheltenham, Montgomery County, Pennsylvania. In his deposition referred to in the text, *infra,* Hecht stated that his law office had been located at 6127 Castor Avenue in Philadelphia, but that he had given up active practice some three years before, which would have been at about the time of his re-

tober 20, 1972, the Court of Common Pleas of Montgomery County suspended Mr. Hecht from practicing law before it for a period of one year.[2] It is from that order that this appeal is taken.[3]

## I.

At the threshold of this case, we deem it appropriate, because of its basic nature, to consider a problem which neither party has raised, viz., the competence of the Court of Common Pleas of Montgomery County to suspend a lawyer from practice before that court. Our first observation is that a complaint of unethical practice or violation of the Code of Professional Responsi-

---

moval to Montgomery County. It appears from his deposition testimony that appellant had become involved in various business enterprises.

[2] The full text of the lower court's order is as follows: "AND Now, October 20, 1972, the Report of the Committee of Censors of The Bar of Montgomery County is hereby approved, and in consideration of the matters therein contained and pursuant to the Recommendation thereof, it is ORDERED and DECREED that Samuel J. Hecht, be and he is hereby suspended from practicing law before the Court of Common Pleas of the 38th Judicial District of Pennsylvania, for the period and duration of one year from the date hereof, and the Prothonotary is directed to enter the said suspension on the roll of attorneys forthwith, and it is further ORDERED and DECREED that Samuel H. [sic] Hecht shall not practice law or hold himself out in any way as being entitled to practice law within the jurisdiction of this court. Notice of this Final Decree is to be forwarded by the Prothonotary to the Prothonotary of the Supreme Court of Pennsylvania, the Superior Court of Pennsylvania; to the Prothonotary of the Commonwealth Court of Pennsylvania; and to the District Justices, and Justices of the Peace of Montgomery County, and to the Clerk of the United States District Court for the Southeastern [sic] District of Pennsylvania.

"The effective date of this Decree shall be November 3, 1972."

[3] This Court has appellate jurisdiction under §202(6) of the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, 17 P.S. §211.202(6).

bility, were it to arise today, would not be within the cognizance of the court below or any other court of common pleas, but of The Disciplinary Board of the Supreme Court of Pennsylvania established by the Rules of Disciplinary Enforcement adopted by this Court in 1972 under its powers to prescribe general rules for admission to the bar and to practice law. Constitution of Pennsylvania, art. V, §10(c). The Disciplinary Rules superseded all other court rules and statutes pertaining to disciplinary enforcement previously promulgated. See Preamble to The Disciplinary Rules and also the repealer section of the Rules, Rule 17-24. The present proceedings, however, antedated the effective date of the Rules of Disciplinary Enforcement and, hence, were properly not transferred to the new Board.[4]

The second preliminary concern relates to the power of the court below to suspend from practice in its jurisdiction an attorney who is, at the time, a member in good standing of the bar of this Court. Rule 14 of this Court (since amended and renumbered Rule 13) was in effect at the commencement of the present proceeding and provided, *inter alia*, that admission to the bar of the Supreme Court "shall entitle such attorney to practice in every Court of this Commonwealth, upon

---

[4] The alleged improper conduct took place on August 4, 1969; in February, 1970, the complaint against appellant was filed with the Montgomery County Bar Association, which thereafter filed a "Petition for Hearing on Charges" by the Montgomery Committee of Censors, an arm of the Court of Common Pleas of Montgomery County. See Act of June 4, 1919, P.L. 384, §1, *as amended,* 17 P.S. §1665 [since suspended by Supreme Court Rule 17-24(a)(6)]. Under Rule 17-25 of the Rules of Disciplinary Enforcement, any disciplinary case pending on the effective date of the Rules "with respect to which a formal hearing has been commenced shall be concluded under the procedure existing prior to the effective date of these Rules". The Disciplinary Rules were first made generally effective September 1, 1972, a date later extended to November 1, 1972. The hearings in the instant case were concluded substantially before that time.

presentation to such Court of a certificate of the Supreme Court that the attorney is a member of the bar of this Court in good standing". (419 Pa. xxxii.) The question arises whether, in light of this rule, a lawyer such as appellant who was in good standing before this Court and thus entitled to practice anywhere in the Commonwealth could for cause shown be suspended by the court of common pleas of one judicial district from the right to practice before that court. This question has not arisen heretofore, so far as we are aware, and in light of the new Disciplinary Rules, it is not likely to recur. The answer to it in this case, it seems to us, is that the appellant was domiciled in Montgomery County, maintained a law office there, and committed the offense in a judicial proceeding in that court. The Court of Common Pleas of Montgomery County had, therefore, a direct and peculiar interest in monitoring the professional conduct of appellant and administering appropriate discipline. It was obviously not intending to usurp an exclusive power of this Court, nor acting in any secretive manner, for in accordance with past practice in such matters, it directed copies of its decree to be sent to this and the other appellate courts of this Commonwealth, and the appropriate federal district court.

Moreover, we are mindful that the purpose of the quoted portion of Rule 14, originally adopted November 18, 1965 (419 Pa. xxv), was to permit the statewide practice of law in Pennsylvania, and eliminate the then existing fragmentation of that right by the need to be admitted to practice in any county other than the one in which a lawyer maintained his law office. It was not designed to take away the control that the courts of common pleas historically exercised over the professional conduct of members of their bars. That did not come about until later, with the adoption of The Disciplinary Rules heretofore mentioned.

We conclude, accordingly, that the decree here involved was within the competence of the court below at the time that it was entered. We, therefore, address the merits of the appeal.

## II.

The order of the court below was in response to a charge of the Committee of Censors of the Montgomery County Bar Association that, in a deposition taken in aid of execution of a judgment obtained against Hecht and his wife in a lawsuit in Montgomery County, appellant had given perjured testimony as to ownership of certain real estate.[5]  At a hearing before the commit-

---

[5] Specifically, the charge was that Mr. Hecht lied under oath when he denied, *inter alia*, that he did not know who owned certain real estate premises located at 112 South Troy Avenue in Ventnor, New Jersey. The record shows that an arbitration award against Hecht and his wife was entered on June 30, 1966. On the preceding day, Hecht had caused the title to the Ventnor property, then in the names of himself and his wife, to be transferred to the names of himself and his wife as trustees for their children. The declaration of trust contained in the deed was by its terms revocable by the grantors or the survivor of them at any time, and the grantors reserved the right to sell the premises free and clear of all trusts. The portion of the deposition testimony principally giving rise to the charge of perjury is as follows: "Q. [By the attorney for the judgment creditor.] Didn't you leave an address for the post office to forward your mail to 112 South Troy Avenue, Ventnor, New Jersey? A. I may have. I don't recall. Q. Well, what do you do at 112 South Troy Avenue, Ventnor, New Jersey? A. Sometimes I go there. Q. Well, what do you do when you go there? A. Sleep there. Q. Is that your place, that you own? A. I don't own a house. Q. Who owns this place? A. I don't know. Q. Well, you've been there for the last three or four years, have you not? A. That's right, but I don't own it. Q. I didn't ask you that. I asked you who owns it. A. I don't know. Q. You don't know who owns it? A. No. Q. Is it in the name of your wife? A. No. Q. Any of her relatives? A. Not that I know of. Q. Is it in your name? A. No. Q. Any of your relatives? A. No. Q. Is it in the name of Skalsky,

tee, the appellant denied any intention to lie, but persisted in his assertions that he did not know who owns the property in question, stating that it was a matter of legal interpretation. The committee in its report concluded that "when [Hecht stated that] he didn't know who owned the property when he was a grantor gives pause for serious concern. His further reaction that he didn't think he had any interest in it when he had full power to revoke [the declaration of trust for his children] is a conclusion which no reasonable [sic] minded person could accept . . . . When he . . . testified that he did not know in whose name the property was held, he was obviously telling an untruth". The committee recommended admonition and censure or such suspension as the court might deem proper.

The appellant made no objection before the Committee of Censors or the lower court as to the procedures followed or the evidence adduced; the sole question was the sufficiency of the evidence to establish that a lie had been told. At the hearing before President Judge GROSHENS following receipt of the committee's report, appellant's counsel pointed out that the judgment in question had been paid in full and made a plea for a "generous and mild" disposition; the ap-

---

or any of his relatives A. No. Q. Well, whose name is it? A. I don't know. Q. What interest, personal interest, do you have in that property? A. None whatsoever. Q. Who do you pay rent to? A. I don't know. Q. Do you pay rent? A. No. Q. Who pays the rent? A. I don't know. Q. How long have you been occupying those premises, at 112 South Troy Avenue, Ventnor? A. Three years, I guess. . . . Q. What do you do down there? Do you visit there with your wife? A. Sometimes. Q. With your children? A. Sometimes—no, not with my children. Q. Your children are never there? A. Never there. Q. Your children have never been there? A. They've been there." While in later testimony appellant admitted that a trust had been created for the Ventnor property, he continued to assert that he did not own the premises and did not know who did. He declined to answer for whose benefit the trust was created.

pellant, given an opportunity to speak in his own behalf, stated, "I have nothing to say, your Honor." We have no doubt, on reading the entire record before us, that the bar committee was fully justified in concluding that appellant had lied under oath, and, therefore, that the Court of Common Pleas was equally justified in approving and acting upon the committee's report.[6]

The appellant contends that even if he did lie in his deposition testimony, this was not an act which warrants the imposition of discipline, since it did not involve unprofessional conduct *in his office of attorney.* Act of April 14, 1834, P.L. 333, §73, 17 P.S. §1661 ("If an attorney at law shall misbehave himself *in his office* of attorney, he shall be liable to suspension, removal from office, or to such other penalties as have hitherto been allowed in such cases by the laws of this Commonwealth").[7] (Emphasis supplied.) This issue was not raised below, and there is no warrant for us to consider it now. We must note, however, lest there be any misapprehension, that it would be anomalous indeed for us to condemn, as we do, a lawyer's knowing participation in the introduction of perjured testimony by a client, see EC 7-26, Code of Professional Responsibility, 438 Pa. xxv, at xciii, and at the same time condone the giving of such testimony by a lawyer himself.[8] The Code of Professional Responsibility

---

[6] No contention is made to us that the penalty imposed by the lower court was excessive or harsh, or that the court in any way abused its power or discretion in the action it took.

[7] The Act of 1834 has been suspended by Rule 17-24 of the Rules of this Court as to Disciplinary Enforcement. Contrast Rule 17-3 of this Court which provides that misconduct of an attorney shall be grounds for discipline *"whether or not the act or omission occurred in the course of an attorney-client relationship".* (Emphasis supplied.)

[8] Under The Penal Code of 1939, a person who gave false testimony under oath "in any deposition taken pursuant to the laws of this Commonwealth . . . is guilty of perjury, a felony . . . ." Act

merely states the obvious and declares preexisting law when it provides that a lawyer shall not engage in "conduct involving dishonesty, fraud, deceit or misrepresentation" or conduct that is "prejudicial to the administration of justice". [DR 1-102 (A)(4) and (5), 438 Pa. xxxi.] False swearing in a judicial proceeding is certainly an egregious species of dishonesty and is surely also patently prejudicial to the administration of justice. This is doubly so when it is a lawyer who is the perjurer.[9] That the lawyer was acting on his own behalf and not that of a client when the perjurious statements were made can in no wise serve to insulate him from disciplinary action by the courts to which he is admitted to practice. As we said in *In Re Gottesfeld*, 245 Pa. 314, 317, 91 A. 494 (1914) : "It was of no consequence that in commiting [sic] the offense of which he was convicted appellant was exercising no function of his professional office. The offense was in its nature crimen falsi, involving employment of falsehood to injuriously affect the administration of public justice, and was therefore an infamous offense. The disbarment that followed was not punitive, but protective simply. Courts can command public confidence only as those who serve therein are themselves observ-

---

of June 24, 1939, P.L. 872, §322, 18 P.S. §4322. The Crimes Code of 1972 makes the giving of false testimony under oath in any official proceeding when the statement is material and the deponent does not believe it to be true a felony of the third degree. 18 Pa. S. §4902, effective June 6, 1973. It is, of course, not necessary that a lawyer be convicted of the crime of perjury before he can be disciplined for unprofessional conduct because of false swearing. *See, e.g., Wolfe's Disbarment*, 288 Pa. 331, 335, 135 A. 732 (1927).

[9] We are reminded of the comment of Daniel Webster: "Tell me a man is dishonest, and I will answer he is no lawyer. He cannot be, because he is careless and reckless of justice; the law is not in his heart, is not the standard and rule of his conduct." D. Webster, Speech to the Charleston, South Carolina Bar, May 10, 1847.

ant of the law which it is the duty of the courts to enforce. In his high office the attorney-at-law is a minister of justice; he ceases so to be when, whether in the line of his professional work or outside of it, he prostitutes his knowledge of the law and the skill he has acquired therein to thwart the law by deceit and falsehood in its one and only purpose, viz, to accomplish distributive justice among men." See also *Wolfe's Disbarment*, 288 Pa. 331, 135 A. 732 (1927).

Appellant also contends that he was denied due process of law in that he was not informed of the charges against him and in that the rule of court under which the Committee of Censors acted (authorizing investigation of attorneys "in their conduct as individuals involving moral turpitude") sets an unconstitutionally vague standard.[10] Neither point was made below, and appellant may not raise them for the first time on appeal.

The order is affirmed.

Mr. Justice NIX took no part in the consideration or decision of this case.

---

[10] No denial of due process was asserted of the sort condemned by this Court in *Schlesinger Appeal*, 404 Pa. 584, 172 A. 2d 835 (1961).