**In re Anonymous No. 126 D.B. 90**

Disciplinary Board Docket no. 126 D.B. 90.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

SLOANE, *Member,* March 29, 1993—Pursuant to Rule 208(d)(2)(iii), Pa.R.D.E., the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits

its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On November 26, 1990, the Office of Disciplinary Counsel filed a petition for discipline of respondent, docketed at no. 126 D.B. 90. The petition contained two charges of misconduct based upon respondent's alleged misrepresentations to clients, including the creation of false legal documents.

After obtaining the proper extension of time, respondent filed an answer to the petition on January 16, 1991, at which time he denied any wrongdoing.

The matter was referred to Hearing Committee [ ], which was chaired by [ ], Esquire, and included [ ], Esquire, and [ ], Esquire.

On June 15, 1991, petitioner and respondent entered into a stipulation regarding the facts underlying the charges of misconduct. The parties reached an agreement about the basic facts surrounding the alleged misconduct, but were unable to concur on the question of whether respondent had in fact acted in an unprofessional manner.

Hearings on the matter were held on July 10, 1991 and July 26, 1991. On January 3, 1992, the Hearing Committee filed its report and recommended that respondent be suspended from the practice of law for a period of one year and one day.

On January 23, 1992, petitioner filed a brief on exceptions to the findings of the Hearing Committee.

Respondent followed suit, filing his own brief on exceptions on January 27, 1992 and requesting oral argument.

On February 18, 1992, respondent filed a brief opposing petitioner's exceptions.

Petitioner filed a brief in opposition to respondent's exceptions on February 27, 1992.

On March 23, 1992, the Office of Disciplinary Counsel filed a petition to reopen the record based on the fact respondent had lied under oath before the Hearing Committee concerning where he had graduated from law school. The Disciplinary Board ordered, on April 2, 1992, that the record be reopened for a period of 60 days.

Oral argument was held before a three-member panel of the Disciplinary Board on August 20, 1992.

The matter was originally adjudicated at the October 23, 1992 meeting of the Disciplinary Board of the Supreme Court of Pennsylvania. The matter was reopened and reconsidered at the December 18, 1992 and February 25, 1993, meetings of the Disciplinary Board.

## II. FINDINGS OF FACT

We make the following findings of fact, based upon the documentary and testamentary evidence presented in this matter:

(1) Petitioner, whose principal office is located at Suite 400, Union Trust Building, 501 Grant Street, Pittsburgh, PA 15219, is invested, pursuant to Rule 207, Pa.R.D.E. with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, [ ], Esquire, was born in 1944, admitted to practice law in the Commonwealth of Pennsylvania in 1974, and his office is located at [ ].

## Charge I

(3) On July 10, 1978, [A] filed suit against [B] for support. Respondent thereafter was retained by [B].

(4) By consent order dated August 3, 1978, the court set forth support payments to be made by [B]. (Ex. P.E. 2.)

(5) On September 16, 1981, a complaint in divorce was filed.

(6) By consent order dated October 5, 1982, the August 3, 1978 support order was continued in effect, with the addition that [B] was to maintain full medical coverage for his wife until further order of court. (Ex. P.E. 3.)

(7) On October 21, 1982, a divorce decree was entered, but the court retained jurisdiction concerning questions of support and equitable distribution between the parties of marital property which remained outstanding. Those issues involved, inter alia:

(a) Ownership of the marital residence;

(b) Ownership of business property located at [ ];

(c) Ownership of insurance policies;

(d) Questions of alimony and support; and,

(e) Blue Cross/Blue Shield coverage for [A] and [B's] daughter.

(8) Between 1982 and 1987, negotiations as to those issues were undertaken intermittently, but no settlement was reached.

(9) On May 27, 1987, respondent filed an amended pre-trial statement on behalf of [B], in which certain

recommendations were made for settlement of the equitable distribution, alimony, and other matters.

(10) In the summer of 1987, respondent forwarded to [B] a purported order of court dated May 29, 1987. (Ex. P.E. 4.)

(a) The order bore the indication that it had been approved by "Judge [C]," and consented to by respondent and Attorney [D], the attorney for [A].

(b) The order recited that the following settlement terms had been reached:

(i) [A] was to receive the marital residence and [B] was to receive the business property, both subject to the respective mortgages;

(ii) [A] was to receive $35,000;

(iii) Support was set at $1,000 per month, based on $500 support for a dependent child; and,

(iv) [A] was to maintain her own medical insurance effective August 1, 1987 and [B] was to maintain medical insurance for the dependent child while she was in college.

(c) Such order was never approved by Judge [C], nor consented to by [D].

(d) Respondent created or caused to be created this false order of court in order to deceive [B] into believing that a settlement in the matter had been reached.

(11) In about July 1987, respondent forwarded to [B] a purported order of court dated July 15, 1987, which, inter alia, assertedly reduced [B's] support and alimony obligation from $1,500 per month to $750 per month, and ordered payment by [B] of $550 per month to the court on the settlement of the equitable distribution matters. (Ex. P.E. 5.)

(a) Such purported order bore the purported signature of [ ] County Common Pleas Judge [E].

(b) Such an order was neither signed or entered, nor caused to be signed or entered, by Judge [E].

(c) Respondent's implication that the order had been entered was falsely made.

(12) Also at about that time, respondent represented to [B] that the business property located on [ ] in [ ], which was previously in the name of both [B] and [A], had been deeded to [B] in his name only.

(a) The property had not been deeded to [B] in his name only and was at that time in the names of both [B] and [A].

(b) Respondent's representation to [B] that the property had been deeded to him in his name only was falsely made.

(13) From about July of 1987 through early 1988, [B] requested information concerning the property dispute with his wife, and photocopies of the deed transferring the business property to his name only.

(a) On each occasion, respondent represented to [B] that "everything was going fine"; that there was "no problem"; and that respondent would send him photocopies of the deed.

(b) As the property had never been transferred to [B's] name only, respondent's implied misrepresentations that such had occurred was falsely made.

(14) In about early 1988, respondent forwarded to [B] what purported to be a copy of the deed from [B] and [A] to [B] in his name only. (Ex. P.E. 6.)

(a) That copy bore upon it a notation that it had been recorded on October 20, 1987, in deed book volume [ ], page [ ], with a purported acknowledgment of such recording by the recorder of deeds, [F].

(b) In fact, that volume and page number reflects a deed between [G] and [H] for property located in [ ]. (Ex. P.E. 7.)

(c) Respondent created or caused to be created a false document which purported to be a copy of a deed for the business property from [B] and [A] to [B] in his sole name.

(15) On about May 6, 1988, Attorney [I] contacted respondent on behalf of [B], and inquired about the purported settlement. During that conversation:

(a) Respondent told [I] that, in fact, a settlement had been reached.

(b) Respondent further stated that [D] "must have lost the papers."

(c) Since no settlement had actually been reached, respondent's representations to [I] were falsely made.

(16) Respondent forwarded to [B] a letter dated May 9, 1988. (Ex. P.E. 8.)

(17) In about mid-June 1988, respondent admitted to [I] and [D] that no settlement had been reached in the matter.

*Charge II*

(18) In July of 1978, [J], a social acquaintance, met with respondent to discuss various problems he encountered while dealing with a local car dealership, [K] and [L].

(a) Respondent informed [J] that a suit could be filed under the Magnuson-Moss Act.

(b) Respondent further told [J] that he would represent him in this legal endeavor.

(19) By check dated July 2, 1978 and numbered 436, [J] paid respondent $35 to cover costs that would

be incurred with the initiation of the suit. At that time, respondent informed [J] that a suit against [K] and [L] would be filed in the event that no settlement could be reached.

(20) Beginning in about 1980, respondent:

(a) Represented to [J] that a suit had been filed against both [K] and [L]; and,

(b) Thereafter, on various occasions, respondent continued to lead [J] to believe that the suit was ongoing.

(21) On at least one occasion, respondent informed [J] that an arbitration hearing was scheduled in [ ] County and that his appearance would be necessary.

(a) On October 3, 1980, [J], a teacher with [M] High School, took leave of his employment to attend this "hearing."

(b) In regard to the October 3, 1980 hearing, respondent provided [J] with a "subpoena" dated September 26, 1980 which indicated that [J] was to appear at room 523 of the courthouse in [ ] at 9 a.m. to testify and he was to bring with him all documents pertaining to a 1977 Mercury. (Ex. P.E. 9.)

(c) On the reverse side of the subpoena, it was indicated that [J's] case was docketed at [ ] of *1980;* however, the case was listed as [ ] of *1979* on the front side of the subpoena. (emphasis supplied)

(d) [J] waited in respondent's office while respondent allegedly presented the case.

(e) Upon respondent's return to the office, respondent stated to [J] words to the effect that he had "won" the case at the arbitration level, but that the case would be appealed to the court of common pleas, necessitating another hearing.

(22) In fact, respondent failed to file suit on behalf of [J] and, as a result, no "hearing" was ever scheduled.

(23) In or about late February or early March 1988, respondent informed [J] that [L] had made an offer to settle for $1,000, which "offer" [J] rejected.

(a) Shortly thereafter, respondent indicated that [L] had increased its "offer" to $1,500, which [J] also rejected.

(b) Later, respondent informed [J] that [L] had increased its "offer" to $6,000, which was to be their "final offer" and which [J] also rejected.

(24) On or about March 9, 1988, respondent told [J] that [L] had raised its "offer" to $7,500, which amount [J] accepted. Pursuant to that settlement:

(a) On March 9, 1988, respondent presented to [J] a release, allegedly from [L], stating that the settlement amount was $9,094.90. (Ex. P.E. 10.)

(b) When [J] questioned the release form, respondent informed him that this was a "standard form" used by [L].

(c) [J] executed this "release."

(25) In early April 1988, [J] contacted respondent and made a verbal request for his file.

(a) Respondent told [J] that it would take a few days to get the information together and that he would then deliver the file to [J's] home.

(b) Respondent, however, failed to do so.

(26) By check numbered 1072, dated May 21, 1988, and drawn on respondent's "escrow account" held with [N], [ ] Office, account no. [ ] respondent paid [J] $7,500 and informed him that this represented his share of the proceeds. (Ex. P.E. 11.)

(27) The source of these funds was a deposit of personal funds that respondent had made into his escrow account on October 22, 1987.

(28) Thereafter, [J] again requested his file.

(a) In May 1988, respondent told [J] that he would deliver the file to his place of employment.

(b) After several days, [J] received from a school secretary a single, business-size envelope from respondent.

(c) Contained therein was a letter to complainant dated May 25, 1988. (Ex. P.E. 12.)

(29) [J] again contacted respondent and inquired as to the remaining file documents, at which time respondent stated that:

(a) Respondent had "dropped the complete file off to the school secretary;" and,

(b) "That she must have misplaced or lost it."

(30) After repeated requests by [J]:

(a) Respondent forwarded to complainant a letter dated November 2, 1988. (Ex. P.E. 13.)

(b) Respondent failed to deliver a reconstructed file as he had indicated he would in his November 2, 1988 letter.

(31) In January 1989, [J] requested a copy of the "settlement check" from [L].

(32) Respondent forwarded to complainant a letter dated February 7, 1989. (Ex. P.E. 14.)

(33) By letter dated February 20, 1989 (Ex. P.E. 15), respondent enclosed:

(a) The check which respondent purported to be the settlement from [L], dated April 14, 1988 in the amount of $9,455, numbered [ ] made payable to "[respondent], agent" and drawn on [O]. (Ex. P.E. 16.)

(b) A May 11, 1988 letter from a "[P]" in which [P] stated that a check in the sum of $9,094.90 and payable to respondent as attorney for [J] was enclosed. (Ex. P.E. 17.)

(34) In fact, no such letter was received by respondent from a "[P]" of [L].

(35) In fact, the purported check was not a true copy of the original draft, which original draft did not relate to [J's] case.

(36) The original check, draft number [ ] was actually issued on February 14, 1989 in the amount of $4,445, was not made payable to respondent as agent and the claim number [ ], did not relate to [J], [K], or [L].

(37) On March 10, 1989, [J] confronted respondent with this information.

(a) Respondent then admitted to [J] that he had paid [J] from his own funds.

(38) Prior to the instant proceedings, respondent has never been the subject of any disciplinary action in Pennsylvania or Ohio, the jurisdictions in which he is licensed to practice law. (N.T. 80, 81.)

(39) Respondent is extensively involved in pro bono work in his community. (N.T. 89-92.)

(40) Respondent expressed extreme remorse for his conduct in these matters. (N.T. 92.)

(41) Respondent called various character references as follows:

(A) [Q], Esquire, an attorney admitted to practice law in Pennsylvania for approximately 25 years. (N.T. 27-41.) He testified that he met the respondent in approximately 1984. That he has referred clients to respondent on a most continual basis to date. He further testified that respondent had been a tremendous help to him personally and professionally. He further testified that respondent handled numerous closings and purchases of investment property and also handled substantial amounts of money and handled all those matters

in a very timely fashion. He further testified that he represents the [R] Insurance Group, one of the largest primary insurance agencies in [ ] County, and that respondent has performed legal work in connection with its office buildings and assisted in the purchase of properties in connection with the buildings owned by the insurance company. He further testified that respondent represented his family in real estate matters and that his ([Q]) clients have been very, pleased with respondent's services. He finally testified that even though he was aware of the charges against respondent, he would still refer clients to respondent and that he had no concern whatsoever that respondent would ever again engage in similar misconduct.

(B) [S], Esquire, former chairman of the Disciplinary Board, testified that he has been an attorney for 21 years, that he has known respondent for approximately 20 years. (N.T. 3-8, July 26, 1991.) He testified that he knew him personally and through other people and that respondent had an excellent reputation as being a truthful and straightforward person. He further testified that he did not believe that respondent represented any danger to the public as a practicing attorney.

(C) Father [T], a Roman Catholic priest for the Diocese of [ ], testified that he has known respondent for over seven years. (N.T. 9-20, July 26, 1991.) That he was elected as an official of the Parish Council and did volunteer work for the parish. That his involvement was more than just a parishioner who came to Mass; it was very extensive. Respondent also handled legal matters for the Diocese in building a new church. He handled these matters on a pro bono basis. Finally, he testified that through all his dealings with the respondent, both professionally and personally and church related, he had observed absolutely no hint of any dis-

honesty in respondent's past. He did not consider respondent to be a danger to the public as a practicing attorney.

(D) [U], who is a captain with [V], a real estate developer, and the owner of trucking companies, testified that he has known respondent since 1974. (N.T. 111-122, July 10, 1991.) Respondent was the primary attorney on many real estate matters, including a $6,000,000 condo conversion. He has never known respondent to have been involved in dishonesty and considers him to be a fine, upstanding young attorney with unquestionable character.

## III. CONCLUSIONS OF LAW

Respondent's conduct violated the following Disciplinary Rules of the Code of Professional Responsibility and the Rules of Professional Conduct:

(A) D.R. 1-102(A)(3). Respondent violated the prohibition against a lawyer engaging in illegal conduct involving moral turpitude when he created fictitious court papers and presented them to his client as authentic.

(B) D.R. 1-102(A)(4) and R.P.C 8.4(c). Respondent's creation of alleged court documents and his intentional misrepresentations to his clients concerning the status of their cases epitomizes the dishonest, fraudulent, deceitful, and misrepresentative conduct proscribed by these rules.

(C) D.R. 1-102(A)(5). The administration of justice was effectively thwarted when respondent took actions designed to persuade his clients that he was pursuing their objectives in the courts, but which in fact resulted in their exclusion from the legal process.

(D) D.R. 7-102(A)(5). Respondent violated this rule when he knowingly made false statements concerning the status of property and his actions in dispute in the [B] divorce matter.

(E) D.R. 6-101(A)(3). Respondent's neglect of [J's] claim for civil damages after he had accepted a fee which was to be applied to the cost of initiating a lawsuit violated D.R. 6-101(A)(3).

(F) D.R. 7-101(A)(1). Respondent's intentional failure to pursue [J's] claim constitutes a violation of his duty to seek his client's lawful objectives through reasonably available means.

(G) D.R. 7-101(A)(2). When respondent chose to ignore his obligation to carry out his contract of employment with [J], he violated this rule.

(H) D.R. 9-102(A) and R.P.C. 1.15(a). Respondent's payment of personal funds to [J] from an escrow account violated these rules.

## IV. DISCUSSION

The issue before this board is twofold. First, there is the question of whether respondent's conduct violated the professional standards required of a member of the Pennsylvania Bar. In the event that respondent's actions do in fact constitute professional misconduct, the second query is the appropriate measure of discipline to be imposed.

The threshold inquiry in this matter is whether respondent's creation of fictitious legal documents, which he then presented to two clients as official court papers, misrepresentations concerning their cases, and neglect of his employment responsibilities, can be deemed professional misconduct. The Office of Disciplinary Counsel bears the burden of proving unprofessional conduct

by a preponderance of clear and satisfactory evidence. *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 580, 506 A.2d 872, 875 (1986). Petitioner has easily shouldered the burden of proof in this matter. The documentary and testamentary evidence support an allegation of professional misconduct, and the stipulation of the parties attests to the authenticity of this clear and satisfactory evidence.

Respondent has acknowledged that on two separate occasions he manufactured "legal papers" which he presented to his clients as authentic, when in fact he had not obtained the court orders he proffered. The creation of fictitious legal documents and misrepresentations concerning case status are an illegal interference with the administration of justice, in violation of D.R. 1-102(A)(3), D.R. 1-102(A)(4), R.P.C. 8.4(c) and D.R. 1-102(A)(5).

Additionally, respondent violated D.R. 7-102(A)(5) when he willfully made false statements of fact and law in the [B] divorce matter. Respondent also violated D.R. 6-101(A)(3), D.R. 7-101(A)(1), D.R. 7-101(A)(2), D.R. 9-102(A) and R.P.C. 1.15(a) when he intentionally neglected to pursue [J's] claim after he had accepted a fee for services, and attempted to remedy this error by payment of personal funds, respondent's admission that all of these events did in fact transpire leads to the inevitable conclusion that petitioner has carried the burden of proving professional misconduct.

The only remaining issue before the board, therefore, is the appropriate disciplinary sanction. The gravamen of the complaint against respondent is his intentional falsification of court documents with the knowledge that such misrepresentations were injurious to both his clients and the administration of justice. There are several Pennsylvania cases involving similar attorney mis-

conduct, which will provide guidance in the dispositionary phase of this proceeding.

We note that respondent has never before been involved in a disciplinary proceeding in any jurisdiction, and that several members of the community, including former Disciplinary Board Chairman [S], testified on his behalf before the Hearing Committee. We further note that the Hearing Committee recommended that respondent be suspended for one year and a day.

In a case nearly mirroring the [B] matter (Charge I in the petition for discipline), the respondent in *In re Anonymous No. 4 D.B. 78,* 10 D.&C.3d 307 (1979) agreed to represent a man in a divorce action, failed to secure the desired results, misrepresented to his client the status of the proceedings, and presented the client with a forged divorce decree in an attempt to placate him. The Disciplinary Board adopted the Hearing Committee's finding that respondent's conduct violated D.R. 1-102(A)(4), D.R. 1-102(A)(5), D.R. 1-102(A)(6), D.R. 7-101(A)(3), and D.R. 7-102(A)(7). The Supreme Court adopted the recommendation of both the Hearing Committee and the Disciplinary Board that respondent be suspended from the practice of law for a period of six months. The rationale for this sanction was respondent's recidivism. This respondent had violated the disciplinary code six times in the past, and had four prior violations of D.R. 1-102(A)(4).

In a similar case, the respondent undertook a wrongful dismissal matter. He terminated the case without his client's consent through the use of a forged document, and attempted to conceal through a series of misrepresentations. *In re Anonymous No. 25 D.B. 84,* 36 D.&C. 3d 637 (1985). The Disciplinary Board's recommendation of a two-year suspension from the practice of law was adopted by the Supreme Court.

The *In re Anonymous No. 49 D.B. 80,* 25 D.&C.3d 13 (1982) case also involved a forgery in which respondent did not profit from his misconduct. In that case, the respondent agreed to the forgery of his late client's signature on a release, and forged the decedent's name on an amendment to the client's inter vivos trust. The Hearing Committee and Disciplinary Board were influenced by respondent's lack of profit from his conduct, and recommended, respectively, a three-month suspension and public censure. The Supreme Court ordered a suspension from the practice of law for a period of three years.

In another similar matter, the respondent was disciplined for filing a false, fraudulent divorce claim and improperly commingling funds, although no escrow monies were mishandled. In *In re Anonymous No. 19 D.B. 79,* 14 D.&C.3d 779 (1980), respondent, who had no prior disciplinary record, was found to have violated D.R. 1-102(A)(4) and D.R. 1-102(A)(5). Respondent received a private reprimand, the rationale for this disciplinary sanction was the fact that the respondent's actions, which did not harm any clients or property, were undertaken in an attempt to extricate himself from a "painful meretricious relationship."

Having reviewed the above cited cases, we also take particular note of a recent case decided by the Supreme Court, viz., *Office of Disciplinary Counsel v. [W],* no. [ ] Disciplinary Docket no. 2, [ ], [ ].

In *[W],* the respondent was retained by a client to represent him in a divorce. At one point in time, the respondent mailed to his client a document purported to be a decree in divorce which allegedly was signed by a judge of the Court of Common Pleas of [ ] County. The respondent also mailed a certificate purporting to verify the accuracy of the aforesaid decree.

Thereafter, when confronted by the judge whose signature respondent had forged, respondent lied to the judge and stated that he did not know how he got the document, or who prepared the order and certification. The Hearing Committee recommended a six month suspension and the Disciplinary Board recommended a one year suspension.

Justice Papadakos, writing for the majority in a de novo review, determined that respondent's conduct warranted disbarment, indicating that "respondent's conduct demonstrates a callous disregard for the very integrity of the judicial process and calls for the most severe sanction." [ ] at page 8.

Upon review of *[W]* it would appear that the disciplinary infraction is similar to the instant case. However, what we believe distinguishes *[W]* from the instant case is that, in *[W]*, the respondent *lied* to the court. As stated by Justice Papadakos:

"Respondent's impeding the discovery of the truth concerning the forgery by lying to the court is both contrary and prejudicial to the administration of justice and also adversely reflects on his fitness to practice law. We have already indicated that we strongly condemn a lack of veracity to judicial authorities because such conduct undermines the integrity of the very process that an attorney swears to uphold. In *Montgomery County Bar Association v. Hecht*, 456 Pa. 13, 317 A.2d 597 (1974), we stated *'False swearing in a judicial proceeding is certainly an egregious species of dishonesty and is surely also patently prejudicial to the administration of justice.' Hecht, supra,* at 21, 317 A.2d at 602." [ ] at page 7. (emphasis added)

The case at bar is unlike the misconduct in *[W]*, *supra,* and unlike the misconduct in *In re Anonymous No. 25 D.B. 84, supra,* which resulted in a two year

suspension because the attorney engaged in a series of misrepresentations to conceal wrongdoing on his own behalf, including *falsely testifying* in the disciplinary hearing. In the instant case, the respondent did not lie to the court or to any tribunal. Instead, he fully admitted his wrongdoing and cooperated with disciplinary counsel. In addition, in *[W]*, [ ], at page 9, the court referenced certain cases involving false swearing, viz., *In re Oxman*, 496 Pa. 534, 437 A.2d 1169 (1981) (solicitation of clients, falsifying contingent fee agreements and requesting a witness to falsely testify) and *Montgomery County Bar Association v. Hecht*, 456 Pa. 13, 317 A.2d 597 (1974) (attorney lied under oath). In both of these cases the respondents received suspensions. In *Oxman*, the court imposed a one and one-half year suspension, and in *Hecht*, the court imposed a one year suspension. In all of the cases reviewed above, the common thread which served as a predicate for the most severe discipline was *false testimony.* Therefore, it would appear that the aggravating factor which influenced the court to reach disbarment in the *[W]* case was the fact that [W] lied to the judge when confronted with his misconduct.

Finally, by way of mitigation in the instant matter, respondent testified that he was extremely remorseful in his actions. (N.T. 92.) Respondent indicated that any explanations he might have as to how or why he engaged in acts of misconduct were not to excuse his conduct in any way. (N.T. 54.) He did not gain or benefit in any way from his actions. (N.T. 55.) In the [J] matter, respondent paid $7,500 out of his own pocket. In addition, as aforesaid, he completely cooperated with the disciplinary system and had an unblemished record during approximately 18 years of practice. His character tes-

timony was impeccable, including two reputable lawyers, one of whom had significant contact with the disciplinary system, a businessman and a Roman Catholic priest, all of whom indicated that respondent performed significant legal work for the church on a pro bono basis.

Unlike the dishonesty found in a majority of the other disciplinary cases, respondent did not intend to harm or injure his clients, or to realize any benefit or gain by his conduct, nor, for the most part, was it intended to conceal wrongdoing, nor did respondent lie to the court as did the respondent in *[W]*. In fact, neither client was harmed, and one of them, as aforesaid, received $7,500 at respondent's expense.

Respondent's brief on exceptions to the report of the Hearing Committee [ ] very accurately states that respondent's "dishonesty was simply a misguided and, frankly, stupid means of attempting to deal with two particularly troublesome and difficult clients."

It has always been the position of the Supreme Court that there are no "per se" rules in disciplinary matters. Justice Hutchinson stated in *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 280, 472 A.2d 186, 190 (1983):

"We decline to adopt such a rule [per se]. While we are mindful of the need for consistency in the results reached in disciplinary cases so that similar misconduct is not punished in radically different ways, we are also concerned that each case, subject as it is to our exclusive jurisdiction and de novo review, be decided on the totality of facts present. The position urged by Disciplinary Counsel would provide uniformity at the expense of the dis-

cretion and fact-specific considerations needed to fashion appropriate discipline. The gravity of any disciplinary proceeding requires not only the presentation of all relevant facts, but also our retention of the discretion necessary to evaluate those facts. Such discretion is incompatible with the per se rule urged by Disciplinary Counsel."

This refusal of the Supreme Court to adopt "per se" rules was again restated by Justice Papadakos in *Office of Disciplinary Counsel v. Kanuck,* 517 Pa. 160, 174, 535 A.2d 69, 76 (1987). Therefore, we must follow the guidance of the Supreme Court and determine each case on the totality of the facts of record.

Upon reading the entire record in the instant case, although the matters such as creating false court documents are of grave concern, we do not believe that this respondent is of such a danger to the public to require a disbarment as in *[W], supra;* or a suspension of three years similar to the decision in *In re Anonymous No. 49 D.B. 80, supra.* Nor do we believe respondent should receive the lower range of possible disciplinary sanctions such as the six month suspension or private reprimand administered in certain of the other cases reviewed above. Nevertheless, the aforementioned cases illustrate that conduct similar to respondent's constitutes a serious breach of professionalism, and warrants a strict disciplinary sanction. It is our contention that a two-year suspension from the practice of law, similar to the decision in *In re Anonymous No. 25 D.B. 84, supra,* will both recognize the seriousness of this respondent's misconduct, and protect both the public and the bar. See also, *Office of Disciplinary Counsel v. Stern,* 515 Pa. 68, 526 A.2d 1180 (1987). Although not binding, all of the above reviewed cases

are instructive on the necessity of imposing a suspension from the practice of law where a client has been deceived by an attorney. The instant matter involves two instances of client misrepresentation, coupled with the presentation of fabricated court documents and infractions concerning employment terms and accounting practices, and therefore warrants the imposition of a particularly strong measure of discipline. However, we do not believe that the interest of the public would be served by imposing more than a two year suspension. We are mindful that respondent has violated disciplinary rules involving creating false court documents and we believe that this is a serious matter. Nevertheless, we are impressed with respondent's background and character testimony, which indicates to us that the most drastic sanction, viz., disbarment, is not warranted. We are confident that our recommendation of a two year suspension will satisfy the objective of the disciplinary system relative to this particular respondent.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent, [ ], be suspended for two years. It is further recommended that the court direct that respondent pay all of the necessary expenses incurred in the investigation and processing of this matter pursuant to Rule 208(g), Pa.R.D.E.

Mr. Witherel and Mr. Paris dissented and would impose public censure.

Mr. Leonard and Mr. Hill did not participate in the adjudication.

Ms. Flaherty also did not participate in the adjudication.

DISSENTING OPINION

WITHEREL & PARIS, *Members*—
To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

The undersigned respectfully dissent to the opinion filed by the majority members of the Disciplinary Board in the above-captioned matter. The findings of fact and conclusions of law are not in dispute. The issue in dispute is the appropriate measure of discipline to be imposed. The following mitigating factors as set forth in said findings of fact are relevant to the issue of discipline:

(1) The respondent has been admitted to practice and has practiced law in the Commonwealth of Pennsylvania and State of Ohio for 19 years, and has never been the subject of any disciplinary action in either jurisdiction. (Finding of fact nos. 2 and 38.)

(2) When confronted with the violations of the Disciplinary Rules of the Code of Professional Responsibility and the Rules of Professional Conduct which are the subject matter of this discipline, respondent admitted to his wrongdoing and has been extremely remorseful. (Findings of fact nos. 17, 37, and 40.)

(3) In the course of his 19 year practice, respondent has been involved extensively in pro bono work for a variety of community and church organizations. (Findings of fact no. 39.)

(4) Respondent provided character references of exceptional quality. These witnesses included fellow attorneys who had referred legal matters to him, clients who had intended to continue to consult him as their attorney, and his parish priest who testified concerning his pro bono legal work for the parish and his extensive involvement in church and civic-related affairs. (Findings of fact no. 41(a) through (d).)

Moreover, even the majority finds that respondent did not intend to harm or injure his clients or to realize any benefit or gain from his conduct.

Under the circumstances of this particular case, it is respectfully submitted that the appropriate discipline to be imposed is that of public censure.

## ORDER

August 4, 1994—The rule to show cause entered by this court on September 28, 1993, is discharged, and it is hereby ordered that [respondent] be and he is suspended from the bar of this Commonwealth for a period of two years, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Papadakos files a dissenting statement in which Mr. Justice Castille joins.

Mr. Justice Montemuro is sitting by designation as Senior Justice pursuant to Judicial Assignment Docket no. 94 R1801, due to the unavailability of Mr. Justice Larsen, see no. 127 Judicial Administration Docket no. 1, filed October 28, 1993.

## DISSENTING STATEMENT

PAPADAKOS, *J.,* August 4, 1994—I must dissent to the majority's imposition of a two year suspension from the practice of law of [respondent] for his deliberate and calculated falsification of a court subpoena, two court orders, a deed, a letter, a check and a release.

We have already settled the question that it is illegal to forge court documents and that such conduct involves moral turpitude, is prejudicial to the administration of justice and adversely affects one's fitness to practice

law. *Disciplinary Counsel v. Holston,* 533 Pa. 78, 619 A.2d 1054 (1993). The deceit and dishonesty involved in forging a court document are self-evident and, in my view, indicate respondent's unfitness to continue practicing law and call for his disbarment.

In *Holston,* we disbarred an attorney for forging a court order and the majority attempts to distinguish that case from the facts before us because Holston also tried to cover up the forgery when questioned by a court. This is a distinction wholly without substance. The penalty in *Holston* was justified because of the presence of forgery *and* lying and I am of the view that either of these wrongs, standing on their own, injuriously affects the administration of justice and requires the imposition of disbarment. Respondent's repeated acts of forgery show a callous disregard for the truth and honesty towards his clients. Such conduct is reckless and the antithesis of the allegiance and fidelity to truth that we expect from members of the bar and, in my view calls for respondent's disbarment.

Mr. Justice Castille joins this dissenting statement.